**DYMO INDUSTRIES, INC., Appellant,**

v.

**COM–TECH, INC., Appellee.**

**DYMO INDUSTRIES, INC., Appellant,**

v.

**AVERY PRODUCTS CORPORATION, Appellee.**

**Nos. 21533, 21534.**

United States Court of Appeals
Ninth Circuit.

Jan. 17, 1968.

No. 21533:

Carl Hoppe (argued), San Francisco, Cal., Harris Zimmerman, Oakland, Cal., for appellant.

Ashley Stewart Orr, Kendrick, Subkow & Stolzy, Los Angeles, Cal., for appellee Com-Tech, Inc.; Thomas F. Reddy, Jr., Keith E. Mullenger, Pennie, Edmonds, Morton, Taylor & Adams, New York City, of counsel.

No. 21534:

Hoppe, Mitchell, Murtha & Anderson, San Francisco, Cal., Gardner & Zimmerman, Oakland, Cal., for appellant.

Christie, Parker & Hale, Andrew J. Belansky, John F. Powell, Pasadena, Cal., for appellee, Avery Products Corp.

Before BARNES and JERTBERG, Circuit Judges, and McNICHOLS,* District Judge.

BARNES, Circuit Judge:

Dymo Industries, Inc. herein appeals from two judgments rendered by the District Court for the Central District of California in related patent actions. The two suits were consolidated for trial concerning the validity of the patents in question. No. 21533—an infringement action—was heard by the district court pursuant to 28 U.S.C. §§ 1338(a), 1400 (b) (1964), and No. 21534 was a declaratory judgment action authorized by 28 U.S.C. § 2201 (1964). Our jurisdiction rests on 28 U.S.C. § 1291 (1964).

## I. BACKGROUND OF THE APPEAL

Three patents are in issue, all of which were originally issued to D. W. Souza and are presently owned by Dymo. Each of the patents relates to an embossable plastic tape on which characters may be stamped to create what have become relatively familiar plastic labels. The labels may be produced individually and inexpensively by use of a hand embossing machine, and have therefore become rather widely used by small businesses and private individuals as well as by industry in general. The distinctive feature of the tapes is that, when they are embossed, the characters thus stamped upon them take on a white color, contrasting with the original dark shades of the plastics. This "stress-whitening" quality of the plastics used—which are described in the patent claims as polyvinyl chloride and copolymers of polyvinyl chloride, especially copolymers of vinyl chloride and vinyl acetate—renders the finished label particularly readable and attractive.

The patents in question are the following:

(a) No. 2,925,625, dated February 23, 1960, and entitled "Contrast Color Embossed Plastics and Method of Production." This patent covers the method for producing the labels described above, and will be referred to as the " '625 patent" or the "method patent."

(b) No. 2,996,822, dated August 22, 1961, and entitled "Contrast Color Embossed Plastics." This patent has as its subject matter the plastic labels themselves, and will be referred to as the " '822 patent" or the "label patent."

(c) No. 3,036,945, dated May 29, 1962, and entitled "Embossable Plastic Assembly." The subject matter of this patent is a product marketed by Dymo and others consisting of three layers: (1) the tape described above, (2) a pressure-sensitive adhesive material, and (3) a removable backing. The assembly is constructed so that one can emboss the plastic, peel off the protective backing, and easily apply the resulting adhesive-backed label to the surface to which he desires to attach it. This patent will be referred to as the " '945 patent" or the "adhesive tape patent."

Asserting that these patents (along with others not here in issue) had been

* Hon. Ray McNichols, United States District Judge, Boise, Idaho, sitting by designation.

infringed, Dymo brought suit in No. 21533 against Com-Tech, Inc., a maker of tapes similar to those described above, seeking damages and injunctive relief. Com-Tech denied infringement and pleaded the invalidity of all three patents. Avery Products Corporation, another manufacturer of embossable plastic tapes, then brought suit in No. 21534, seeking a declaration of its rights with respect to the products covered by the Dymo patents. Finding that an actual controversy existed in the latter action, the district court ordered the two suits consolidated for trial as to the patents' invalidity. C.T. 1–2. After trial, the court rendered judgment against Dymo in each case, holding that the Dymo patents were invalid and that they had not been infringed by Com-Tech. In view of its conclusion with regard to invalidity, the court found further proceedings in No. 21534, dealing with the question of Avery's possible infringement, to be unnecessary. It is from these judgments that Dymo now appeals.

The essential questions for our determination concern whether there is substantial evidence in the record to support the trial court's findings, leading to its conclusions of law, that the Dymo patents are invalid because their subject matter (a) was anticipated by the prior art and therefore lacked the requisite novelty under 35 U.S.C. § 102(a), (b) (1964),[1] and (b) was rendered "obvious" by that prior art and therefore was unpatentable under 35 U.S.C. § 103 (1964).[2]

## II. ISSUANCE OF THE SOUZA PATENTS

The district court's findings of fact relating to the issuance of the Dymo patents find full support in the record and are summarized in the discussion immediately following. D. W. Souza, to whom the patents in question were orginally issued, had been engaged in the radiator repair business prior to his involvement in the matters giving rise to these actions. In the course of his work he had hand-embossed metal tapes to produce radiator identification tags. Deciding that plastic might be used for such tags as well as metal, he procured from the Union Carbide Corporation sheets of various commercially available plastics. In hand-embossing them he noticed that on certain of the plastics the embossed characters were whitened, in contrast with the darker color background of the unembossed areas.

After further experimentation Souza applied for the patents here in question. The district court found that the prior art considered by the Patent Office took cognizance of the whitening effect upon which Souza's applications were based, but did not utilize the effect to produce color-contrast writing. Even on the basis of this prior art, the Examiner in the prosecution file of the method patent at first rejected the claims, stating that

"[O]ne skilled in the art, knowing that the usually undesirable surface whitening effect will occur if low sheet temperature [sic] are used, i. e., cold working of such sheets, could easily adapt

---

1. Section 102 reads as follows:
    "A person shall be entitled to a patent unless—
    "(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
    "(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the

application for patent in the United States * * *."

2. "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. * * *"

this knowledge to arrive at applicant's process if this surface effect was desired." C.T. 75–76, 142.[3]

Souza prevailed over this initial rejection, however, by contending that his invention consisted essentially of the recognition of a desirable result (the production of color-contrast, embossed writing) from an effect (stress-whitening of certain plastics) which had previously been thought undesirable.

The district court found that the most pertinent prior art, however, was not before the Patent Office when it approved Souza's applications, and that therefore the presumption of validity attaching to the method and label patents, 35 U.S.C. § 282 (Supp. II, 1967), was overcome:

"This prior art comprised prior publications, prior patents and prior knowledge and uses as to the desirability of employing the stress-whitening effect manifested by the same plastics as later used by Souza to produce whitened or color-contrasting lettering or designs upon cold deformation, and it included as to patents and publications:

(1) French Patent No. 859,531, which issued June 10, 1940 to I. G. Farbenindustrie (Ex. AF);

(2) Union Carbide 'Vinylite Rigid Sheets Plastics', 1942 (Ex. S);

(3) Union Carbide 'Vinylite Rigid Sheets Plastics', 1945 (Ex. W); and

(4) German publication entitled 'Kunstoffe in Technischen Korrosionsschutz, Handbuch fur Vinidur und Oppanol', (1943) (1949) (Ex. AJ, Ex. 20),

and, as to prior knowledge and uses, activities, prior to the alleged invention by Souza, at Union Carbide Corporation, Addressograph-Multigraph Corporation, and Industrial Rayon Corporation." C.T. 76–77, 143.

We turn now to an examination of this prior art, through a consideration of the district court's findings relating thereto.

## III. NOVELTY—METHOD AND LABEL PATENTS

### A. *The French Patent*

Findings of fact 14, 15 and 16 read as follows:

"14. French Patent No. 859,531, granted to I. G. Farbenindustrie in 1940, taught that a whitening or color-contrast effect occurred when rigid thermoplastic materials were cold deformed, that this effect could be advantageously used to produce color-contrasting letters and designs on such plastic sheets, and that such lettered sheets could be used for signs and labels. The French patent described polyvinyl chloride and copolymers of polyvinyl chloride as plastic materials suitable for practice of the described method and to make the described lettered sheets, and stated that the whitening effect was enhanced by additives, including talc and diatomaceous earth. The same plastic materials and the same additives are described and claimed in the Souza—'625 and Souza—'822 patents. The French patent, by way of exemplars for producing cold deformation in the plastic sheets, described use of dies and a stylus, each of which is also described for such use in the Souza patents. In concept and in detail as to plastic materials, their additives, the method, and the plastic sheet article, the French patent described that which, several years later, was the subject of the Souza—'625 and Souza—'822 patents.

"15. The teachings of the French patent, read by one skilled in the plastics art such as defendants' expert, Mr. Warren T. Buschmann, were followed by Mr. Buschmann as to samples of

---

**3.** This quotation is taken from the district court's findings of fact. The district judge set out separate findings of fact and conclusions of law in each case, although there is an almost total coincidence between the two sets of findings. Parallel C.T. citations will therefore be supplied when we refer to those findings.

plastic composition prepared by him with laboratory equipment and cold embossed by him in Court. The whitening or color contrast resulting from cold deformation of these samples was the same in kind as that referred to in the Souza—'625 and Souza—'822 patents.

"16. The method claimed in the claims of the Souza—'625 patent and the articles claimed in the claims of the Souza—'822 patent are anticipated by French Patent No. 859,531; the French patent plainly discloses the sole factor upon which the applicant relied, as lacking in the prior art, in overcoming the Patent Office rejection." C.T. 77–78, 143–44.

■■ Dymo challenges these findings by arguing specifically that Buschmann was unable to produce a color-contrasting sheet of plastic in accordance with the teaching of the French patent—and, more generally, that that patent was too indefinite and inaccurate to constitute an anticipation of the Souza method and label patents. We hold, however, that the record supports the district court's finding with regard to Buschmann's demonstration, and that the court's conclusion as to anticipation was correct. Specifically in point is the testimony of Dr. Rodney Andrews, one of Avery's expert witnesses, concerning the teaching of the French patent in comparison with aspects of Souza's applications, R.T. 1000–14; that of Buschmann, to the effect that his demonstration work followed the teaching of the French patent, R.T. 1194–97; and a statement by Dr. Carl S. Miner, Jr., one of Dymo's experts, to the same effect, R.T. 1971–72. See also R.T. 1257–58, Ex. IB. Furthermore, the trial court was hardly compelled as a matter of law to find that the color contrast produced by the method of the French patent differed in any significant fashion from that yielded by the Souza method patent. See *Kalich v. Paterson Pac. Parchment Co.,* 137 F.2d 649, 652 (9th Cir. 1943) (citing rule that "one is not entitled to a patent who merely makes a change in form,

proportion or degree"). The Souza patent does not, in fact, draw any distinction among degrees of "whitening."

**B.  *The Union Carbide Publications***

The district court found that,

"17. As early as 1942, a Union Carbide publication entitled 'Vinylite Rigid Sheets Plastic' (Ex. S) described under a section entitled 'Embossing', the alleged inventive concept of the Souza—'625 and Souza—'822 patents as follows:

'with suitable pigmented thin plastic rigid sheets, cold embossing in shallow designs produces interesting and unusual effects. Male and female dies are used and the sheet is passed between the plates and pressure is applied. In this case, the sheet is formed while cold, and strains are set up which result in a whitening effect in the design. For this reason, embossed lettering produced by this method stands out clearly from the rest of the sheet."

The plastic rigid sheets were described in the publication as copolymers of vinyl chloride and vinyl acetate, the plastic material to which the entire publication was devoted. This was the same plastic material as described and claimed in the Souza—'625 and Souza—'822 patents.

"18. A later Union Carbide publication (Ex. W), issued in 1945, contained the same description as appeared in the 1942 Union Carbide publication regarding cold embossing of rigid plastic sheets to produce whitened lettering or designs. It stated that the copolymers of vinyl chloride and vinyl acetate, to which the publication was devoted, were usually modified by lubricants, stabilizers and additives also referred to in the Souza patents. The 1945 publication also described the higher impact-resisting grades of the vinyl copolymers as most suited to the cold embossing process. It was well known by those skilled in the plastics art that higher impact grades of rigid

plastic sheets are those containing reinforcing fillers, such as aluminum hydrate and the other additives described in the Souza patents. For example, United States Patent No. 2,370,280, which issued to Union Carbide on February 27, 1945, disclosed high-impact plastics consisting of copolymers of vinyl chloride and vinyl acetate compounded with aluminum hydrate as a filler together with stabilizers, plasticizers, and lubricants. These are the ingredients of the Union Carbide VCA—3381 plastic material referred to in the Souza—'625 and Souza—'822 patents. The 3381 formulation of Union Carbide was described as a high-impact material in a 1954 Union Carbide publication entitled 'Bakelite Plastics Vinyl Rigid Sheets Technical Data' (Ex. AB).

"19. The method claimed in the claims of the Souza—'625 patent and the articles claimed in the claims of the Souza—'822 patent are anticipated by the 1942 Union Carbide publication (Ex. S) and by the 1945 Union Carbide publication (Ex. W). The description in these publications also made the selection of Union Carbide's VCA–3381, the vinyl plastic first cold-embossed by Souza and referred to in his patents, a matter of reading a list to select the material meeting the described requirements. Such a list was contained in the 1954 Union Carbide publication (Ex. AB) which described the 3381 plastic of Union Carbide as a high-impact material." C.T. 78–79, 144–46.

Dymo argues that these publications did not sufficiently specify the plastics that could be stress-whitened, and that therefore they should not be held to constitute an anticipation of the method and label patents. We do not pass upon the district court's conclusion with respect to the 1942 brochure, but as to the 1945 publication, we feel that the reference to "higher impact resisting" grades of Vinylite materials (described in the earlier brochure as colpolymers of vinyl chloride and vinyl acetate) may properly have been taken by the district court to have sufficiently specified the stress-sensitive plastics that will produce the effect Souza sought to patent. There was expert testimony to that effect. R.T. 477. We therefore find no fault with the court's conclusion in regard to anticipation by that publication.

## C. The German Publication "Kunstoffe in Technischen Korrosionsschutz, Handbuch fur Vinidur und Oppanol"

Finding of fact 20 of the district court is as follows:

"20. The German book 'Kunstoffe', published in 1943 and republished in 1949, included a section entitled 'Production and Placing of Text on Astralon and Vinidur Signboards'. Vinidur is a German trade name for rigid polyvinyl chloride plastic manufactured by Badische Anilin, a German company. In a subsection of 'Kunstoffe' entitled 'The Pressing of Signboards', use of a cupping process, a type of male and female die stamping which is an embossing process, on the plastic materials was described. It was stated that, when the embossing was done at too cold a temperature, the embossed lettering had a lighter coloration than the base material. It was also stated that this could be used to good advantage because, in the case of signboards, the lettering stood out very well from the background and created a strong impression. The claimed subject matter of the Souza—'625 and Souza—'822 patents is anticipated by the 'Kunstoffe' publication." C.T. 79–80, 146.

Dymo's argument with respect to anticipation by the German publication is essentially the same as that made in connection with the French patent and the Union Carbide publications: it contends that the publication does not specifically disclose the plastics to be used in obtaining stress-whitened labels. The publication does refer to a specific German plastic, Vinidur, which—according to at least one technical publication widely available

long before the date of Souza's patent applications—is a 'rigid, polyvinyl chloride plastic. Ex. HC, R.T. 894–99. That reference alone, however, is insufficient to render us as certain that there has been an anticipation as we are in regard to the French patent and the 1945 Union Carbide publication, and we do not pass upon the district court's conclusion to that effect.

D. *The Work of Myers and Bates*

The district court also found that the previous work of two men, Clarence Myers and D. W. Bates, each constituted anticipation, as follows:

"22. The 1942 and 1945 Union Carbide publications were based upon work performed by Mr. Clayton Myers, a Union Carbide engineer, who between 1939 and 1944, worked with others at Union Carbide in the development and introduction of rigid vinyl plastic compositions. The stress-whitening effect in these plastics was well known to these workers, although, prior to Myers' work, it had generally been treated as a defect of the material. The World War II-induced shortage of metals caused interest on the part of Union Carbide customers to cold embossing of vinyl plastics. The evaluative work done by Myers for and with customers as to cold embossing showed whitened lettering in the embossed areas. Myers, during this period, made nameplates and signs of rigid vinyl plastic sheets on which whitened lettering contrasting with the background had been produced by cold embossing. He provided such embossed nameplates and signs to customers of Union Carbide and also furnished them with rigid vinyl plastics suitable for such embossing. Myers cold-embossed copolymers of vinyl chloride and vinyl acetate containing various reinforcing fillers including aluminum hydrate.

"23. The testimony of Myers, together with contemporaneous documents and materials produced by him, convincingly show that prior to 1944 he demonstrated the practical efficacy and utility of cold-embossing rigid plastic sheets, including the plastics described in the Souza patents, to produce whitened lettering that contrasted with the background color of the sheet. Myers produced the practical result which showed that the stress-whitening effect of rigid vinyl plastics worked to provide color-contrasting lettering, and publicized the results of this work in Union Carbide publications to encourage sales of Union Carbide's rigid vinyl plastic sheets. Myers' work was an anticipation of the claimed subject matter of the Souza— '625 and Souza—'822 patents.

"24. In 1955, Mr. Darwin Bates of Addressograph-Multigraph Corporation, wishing to substitute plastic for metal in Addressograph credit plates, cold-embossed with existing Addressograph cold embossing equipment the same Union Carbide vinyl plastic which Souza cold-embossed some two years later. Bates made many samples of such cards, which demonstrated that cold embossing of this plastic produced whitened lettering which contrasted with the background color of the plastic. Bates thereby practiced the method claimed in the Souza— '625 patent to make the plastic article claimed in the Souza—'822 patent. Representatives of Addressograph during 1955 displayed such cold-embossed credit cards having color-contrasting lettering to representatives of several different companies and disseminated to them, on an unrestricted basis, information concerning the cards and the method of making them in an attempt to commercially exploit them. The well-documented deposition testimony of Bates and Mr. Harold Hutchings, then another Addressograph employee, shows that in 1955 Bates demonstrated the practical utility of cold-embossing rigid plastic sheets to produce cards having whitened lettering that contrasted in color with the background color of the sheet. Although no commercial sales were made of these cards by Addressograph, the em-

bossed plastic cards made by Bates were offered for sale and embodied the very substance of the method claimed in the Souza—'625 patent and the articles claimed in the Souza—'822 patent, and constituted an anticipation thereof." C.T. 80–82, 147–49.

We neither affirm nor reject the district court's conclusions as to anticipation by Myers and Bates. Myers' work was closely related to the Union Carbide publications referred to above, and we need not discuss that work as a separate instance of anticipation. With regard to Bates' work, we think the record supports the conclusion that stress-whitened credit cards were offered for sale by Addressograph to the Richfield Oil Corporation more than one year prior to Souza's patent applications. Dymo admits that sample credit cards were made, and Hutchings testified that he and an Addressograph sales representative met several times with Richfield personnel regarding the possible sale to Richfield of such cards. R.T. 644–48. Furthermore, Bates himself deposed explicitly that the cards were offered for sale. R.T. 619–20. See also R.T. 582–583, 606, 649–659. A strong case is thus made for the proposition that the requirements of 35 U.S.C. § 102(b) (1964) were not met with respect to the method and label patents. See Corona Cord Tire Co. v. Dovan Chem. Corp., 276 U.S. 358, 384–385, 48 S.Ct. 380, 72 L.Ed. 610 (1928); Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., 332 F.2d 406, 416 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964); Philco Corp. v. Admiral Corp., 199 F. Supp. 797, 815–818 (D.Del.1961). Dymo argues, however, that Bates' work represents merely a series of abandoned experiments. And although that contention seems to us doubtful in view of the factual findings and authorities referred to above, it does draw at least some support from the Second Circuit's decision in Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, modified on rehearing, 106 U.S.P.Q. 240, cert. denied, 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955)

(L. Hand, J.), which held that there had been an "abandonment" (negating anticipatory sales and use) in somewhat similar circumstances. In view of the existence of several alternative grounds for affirming the district court's decision, therefore, we decline to pass upon the question of anticipation by Bates.

### E. The Leitz Folders

The district court found that,

"25. Plastic folders having a face sheet of translucent rigid polyvinyl chloride embossed with color-contrasting lettering were used in 1955 at Industrial Rayon Corporation, a company in Cleveland, Ohio. Prior to January 1955, Mr. L. L. Malm, a vice-president of Industrial Rayon, had, while in Germany, obtained fifty of these folders and brought them back to Cleveland where the folders were used by him and other officers of Industrial Rayon. In January 1955 he caused to be issued a purchase order for two hundred and fifty additional folders from the maker, the Louis Leitz Company, in Germany. For purchase identification purposes in the purchase order, Malm used the color-contrasting information embossed on the folders. After these folders were delivered to Malm in Cleveland in February 1955, some of the folders were used by him in corporate files under his supervision and the remainder were given to other officers of the company and to others throughout the company. The face sheets of the folders were plastic sheet articles of polyvinyl chloride having a uniform background color, and they had a contrast color embossment which had been produced by cold deformation of the plastic. The record establishes that the opaque white color of the embossment on the sheets made it apparent to persons skilled in the plastic art that it was made by cold embossment or deformation of the sheet. The use at Industrial Rayon was public and constituted an anticipation of the claimed subject matter of the Souza—'625 and

Souza—'822 patents." C.T. 82–83, 149.

■■ Dymo's challenge to this finding is restricted to the contention that the Leitz folders were not in "public use" within the meaning of 35 U.S.C. § 102(b) (1964), but rather were the objects of a "secret use." It is clear, however, that the folders were not intentionally hidden by Industrial Rayon, as in the situations to which holdings of "secret usage" have been limited. See, e. g., Monolith Portland Midwest Co. v. Kaisar Aluminum & Chem. Corp., 267 F.Supp. 726, 783 (S.D.Cal.1966); E. W. Bliss Co. v. Southern Can Co., 251 F. 903 (D. Md.), aff'd, 265 F. 1018 (4th Cir. 1920). They were found to have been put to ordinary use, and such action is sufficient—where, as here, one skilled in the art would have recognized them as produced by a simple embossing process, R. T. 1043–44—to constitute a "public use" rendering the Souza method and label patents invalid. Hall v. Macneale, 107 U.S. 90, 97, 2 S.Ct. 73, 27 L.Ed. 367 (1883).

## IV. OBVIOUSNESS—METHOD AND LABEL PATENTS

■■ Even if the instances of prior art relied upon are assumed *arguendo* to be insufficient to render the method and label patents anticipated, there can be no doubt (on the basis of the factual findings which the district court properly made) that they approached the subject matter of those patents so closely that whatever improvements Souza may have accomplished were obvious to one skilled in the art. The patents are therefore invalid under 35 U.S.C. § 103 (1964). See Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 335, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945); Griffith Rubber Mills v. Hoffar, 313 F. 2d 1, 3–4 (9th Cir. 1963); Walker v. General Motors Corp., 362 F.2d 56, 60 n. 3 (9th Cir. 1966).

## V. THE ADHESIVE TAPE PATENT

■ It is not seriously disputed that the only original aspect of the Souza adhesive tape patent lay in the supposed originality of the color-contrast label itself. The invalidity of the method and label patents, then, renders the adhesive tape patent also invalid, and the district court's conclusion to that effect must be affirmed. C.T. 105–06, 162.

The district court also found with respect to the adhesive tape patent that:

"34. Prior to October 28, 1957, which was one year prior to the filing of the application on which the Souza —'945 patent issued, G. & S. Sales, Inc., a predecessor of the present Dymo, placed the claimed assembly of the Souza—'945 patent in public use. Prior to that date, the patentee Souza, as president of G. & S. Sales, left with Mr. Lee O. Stafford, head of the Value Engineering Branch at the Puget Sound Naval Shipyard, hand-embossing machines and embossable rigid vinyl plastic tapes in the patented assembly to demonstrate it to other representatives. Stafford and those under his supervision at Puget Sound, prior to October 28, 1957, demonstrated the use of the patented assembly for identification purposes at various shops and offices of the shipyard. By a letter dated September 6, 1957, Souza offered this material for sale by transmitting to Stafford a G. & S. Sales price list setting forth prices for individual rolls of the patented assembly as well as quantity prices for it. Souza testified that he met with Stafford in connection with attempted sales of the patented assembly. The evidence is clear and satisfactory that the activities of G. & S. Sales and the patentee Souza at the Puget Sound Naval Shipyard were for commercial purposes, for the purposes of sale and not experimental; and that the patented assembly was placed in public use at the shipyard prior to the critical date of October 28, 1957.

"35. Prior to October 28, 1957, Mrs. Mildred Silcox, Supervisor of the Plant Account Branch at the Oakland, California Naval Supply Center, received from Mr. Ralph Norvelle, a

representative of G. & S. Sales, Inc., samples of the patented assembly of the Souza—'945 patent, in the form of vinyl plastic tape, an adhesive backing and a paper protective liner, together with a G. & S. Sales price list for the patented assembly. An embossed plastic label of one of the samples of the patented assembly was affixed to the bumper of Mrs. Silcox' car. Based upon the information received from Norvelle, Mrs. Silcox recommended on October 4, 1957 that the tape, so constructed, be used at the Supply Center for Navy identification tags as a substitute for metal identification tags. The samples and information provided to Mrs. Silcox by Norvelle, and her use of the samples, also placed the patented assembly 'on sale' and in public use prior to October 28, 1957.

"36. The deposition testimony of Souza, Stafford, and Mrs. Silcox corroborated by contemporaneous correspondence, samples, and sales information. G. & S. Sales, Inc. provides substantial evidence that, prior to the critical date of October 28, 1957, G. & S. Sales, for the purpose of promoting sales of the patented assembly, placed the patented assembly 'on sale' and in public use in the United States at various naval installations." C.T. 86–88, 152–54.

■ This finding of fact to the effect that G. & S. Sales placed the subject matter of the adhesive tape patent on sale more than a year prior to the patent application is not clearly erroneous, and provides another foundation for the district court's conclusion regarding that patent's invalidity. Souza's deposition reveals an affirmative response to the question whether certain of his activities prior to August 8, 1957, were in connection with the "sale of embossable plastic tapes having an adhesive backing," with a "liner or protective backing on the adhesive." R.T. 1439–40. Stafford testified to a similar effect. R.T. 1420. See also R.T. 1116–17, 1400–02, 1445–46, Exs. CH, CL, CW, KI. Dymo's attempt to limit the subject matter of

the patent to tape assemblies with ductile protective backings—polyethylene, for instance, rather than paper—cannot succeed in view of general language of the patent claims themselves, which cover any assemblies with a "detachable protective backing" (claims 1, 2), or "detachable backing sheet layer" (claims 3, 4). Ex. 3. And testimony tending to show that early sales of the adhesive tape assembly were experimental might reasonably have been overcome in the district court's weighing of the evidence by the contrary testimony referred to above.

■ It is true that Dymo has enjoyed considerable commercial success with the subject matter of the Souza patents. Success in the marketplace is, however, a secondary consideration in evaluating the validity of a patent under 35 U.S.C. §§ 102, 103. See, e. g., Jeddeloh Bros. Sweed Mills, Inc. v. Coe Mfg. Co., 375 F.2d 85, 92 (9th Cir.), cert. denied, 389 U.S. 823, 88 S.Ct. 57, 19 L. Ed.2d 76 (1967). Energetic promotion may make successful a product that has lingered in commercial limbo for years. The needs and attitudes of potential buyers often change, so that a product which did not meet with great demand in one year—or decade—may be eagerly sought by customers in another. Dymo's thriving business may well be the result of such factors. And, although it will not have a monopoly on the labels here in question, that business will no doubt continue to thrive. It is clear, however, that the subject matter of the Souza patents is not sufficiently novel—nor is it sufficiently "nonobvious"—to merit a patent monopoly. The contributions of Souza and Dymo should not be denigrated; but they do not rise to the level of invention. At most, they represent the rediscovery—and the very successful exploitation—of an idea which had been discovered several times before.

Since we affirm the district court's conclusion that the three patents are invalid, we need not consider whether Com-Tech has infringed them.

Affirmed.