**LUNDY ELECTRONICS & SYSTEMS, INC., Plaintiff,**

v.

**OPTICAL RECOGNITION SYSTEMS, INC., Defendant.**

Civ. A. No. 141–72.

United States District Court,
E. D. Virginia, Alexandria Division.

June 15, 1973.

Thomas C. Brown, Jr., E. Waller Dudley, Boothe, Prichard & Dudley, Alexandria, Va., George Whitney, Brumbaugh, Graves, Donohue & Raymond, New York City, for Lundy Electronics & Systems, Inc.

Larry Suiters, Arlington, Va., Jim Zegeer, Browne, Beveridge, DeGrandi & Kline, Jack L. Lahr, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for Optical Recognition Systems, Inc.

## MEMORANDUM OPINION AND ORDER

BRYAN, District Judge.

This is a patent infringement action. The plaintiff, Lundy Electronics & Systems, Inc. (Lundy), a New York corporation with its principal office and place of business at Glen Head, New York, has asserted that the defendant, Optical Recognition Systems, Inc. (ORS), a Delaware corporation with its principal office and place of business at Reston, Virginia, is infringing U. S. Patent No. 3,535,682 (the Patent or Dykaar) by manufacturing, using and selling machines embodying the claimed subject matter of the Patent. Lundy is the assignee and owner of all interest in that patent.

ORS has denied that it infringes the Patent and has counterclaimed for a judgment declaring the Patent invalid, not infringed and unenforceable.

Jurisdiction is founded upon 28 U.S.C. §§ 1338(a), 2201 and 2202. Venue is founded upon 28 U.S.C. § 1400(b).

The trial began on December 4, 1972 where the issues of the litigation were limited to claims 1–4, 9, 11–16, 23, 24, 28 and 30. Following the trial the plaintiff was allowed to take further *de bene esse* depositions of certain witnesses whose *de bene esse* depositions had been offered at trial by the defendant. Those were concluded on February 5, 1973, and post-trial briefs were filed on February 26, 1973.

Lundy has for some years produced and sold a reader for magnetic ink character recognition (MICR). This device "reads" the characters which we all now find imprinted on the lower edge of our checks and deposit slips. Oversimplified, the characters are imprinted on the checks with ink containing a magnetizable substance. These characters are specifically designed so that when they pass under a magnetic charging head and a transducer, from left to right (contrary to the embodiment, Fig. 2, of the Patent which shows passage from right to left), an analog waveform is generated. There are fourteen possible characters comprising what is known as the E–13B font.[1] Ideally each character when read produces a distinctive analog waveform. The distinctive waveform generated by the character "O" is shown in Fig. 2 of the embodiment of the Patent. P.Ex. 14. It and the others are shown in P.Ex. 15A, attached as Appendix I.[2]

---

1. The E–13B font of magnetic ink characters (Appendix I) was specifically designed for use in automatic document handling equipment and has been widely adopted for use on bank checks and the like in the United States. Printers of these E–13B characters are required by the banking industry to satisfy very specific tolerances as to size, shape, ink intensity and positioning so as to make the characteristics of the E–13B characters reasonably predictable. With respect to magnetic characteristics, the E–13B font is designed so that when exposed to a transducer, each character will generate an analog electrical signal or waveform which is unique to that character.

The unique qualities of each E–13B waveform are, furthermore, expected to be discernable at or near eight specific places or times on the waveform. One skilled in the art would be familiar with the E–13B font of characters and the waveforms ideally expected to be generated thereby. P.Ex. 14, col. 3, lines 8–29; P.Ex. 16; P.Ex. 18, Section 2.6.2; Schwarz Tr. 92–103; Bauer Tr. 75, 82, 226.

2. It must be noted that the waveforms for the various characters appearing in Fig. 2 and in P.Ex. 15A (Appendix I) are merely two dimensional graphic representations of the form as they would ideally appear on an oscilloscope.

This analog electrical signal is converted, through a complex electronic circuitry, to digital signals representative of information peculiar to the character read. Because of extraneous influences as well as such imperfections in the printing as uneven density of ink and skew of characters, the "ideal" is rarely met. For that reason a reconstruction of the character must be attempted from those portions of the character which are typical of the ideal. The aim of Lundy and the accused device is to accomplish this.

Character recognition is accomplished by comparing the amplitudes of portions of a character's waveform to a previous or other portion of the waveform. Information bearing digital signals resulting from and representative of these comparisons are generated. They can then be utilized to generate signals identifying the waveforms (characters) in question. P.Ex. 14; Schwarz Tr. 121–129.

ORS has in the past manufactured and sold machines for the reading of detectable characters on documents such as checks. Its system, however, reads the characters optically rather than by MICR. As an adjunct of its optical reader it developed a MICR reader which is the accused device in this action.

For reasons that are later stated, the Court concludes that the Patent is valid, but that in light of the prior art, particularly the Perotto patent (Perotto) (D.Ex. 1), what the inventors have done "works only a slight step forward." Consequently their patent should be given a "narrow scope" resulting in no infringement unless the machine of ORS is an "approximate copy" of the Lundy patent. Under that view there is no infringement here. Eibel Co. v. Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Hazeltine Research, Inc. v. Firestone Tire and Rubber Co., 468 F.2d 1277 (4th Cir. 1972).

If the Lundy patent is a significant enough improvement over Perotto to sustain the Lundy patent against an attack on the ground that it was anticipated by Perotto, then the device of ORS is significantly enough different from Lundy to withstand any charge by the latter of infringement. The *principal* in Perotto, Lundy and ORS of recognizing a waveform by comparison of one or more samplings thereof with another sampling or portion is basically the same. However, the *method* by which this is accomplished and the degree of accuracy resulting therefrom are what distinguish the three.

In the Court's view, Lundy ought not to be allowed to stand pat with its device and stifle further improvements by invoking a broad interpretation of the claims of its patent.

## THE PLAINTIFF AND THE PATENT IN SUIT

Until 1963, Lundy's business consisted principally of electronic defense systems unrelated to the subject matter of this litigation. In October 1963, one David E. Dykaar proposed that a magnetic ink character recognition (MICR) system for use in a bank check sorter might be a possible area of diversification for Lundy, and work was begun on this project in December 1963. A preproduction machine was shown to the industry in early 1965 with the hope that a compact, relatively inexpensive reader would meet a demand as yet unfilled by the large, expensive, high-speed readers then available. Barbato Tr. 42. This machine was well received and interest was expressed by International Business Machine Corporation (IBM) and National Cash Register Company (NCR). A patent application was filed on June 1, 1965, based on this preproduction machine including the MICR reader and various electro-mechanical features of the document handling and sorting apparatus. This resulted in U. S. Patent No. 3,363,756. P.Ex. 15.

IBM and Lundy jointly conducted tests on the preproduction machine and it was determined that when nonuniform characters of the E–13B font (such as

may be expected to be encountered in actual commercial applications) were used, the performance of the machine was unsatisfactory by IBM standards. Accordingly work was begun by Lundy on the development of an improved reader in March or April of 1965. A preproduction or breadboard system was first tested in August and September of 1965 and was found to perform better than the previous device and to satisfy the commercial standards of IBM. The patent application culminating in the Patent was filed on this system on December 10, 1965. Barbato Tr. 7–19, 42, P. Ex. 1.

## PROSECUTION HISTORY

The history of the Patent indicates, that the application as filed contained twenty-six claims plus one "omnibus" claim 27 included for the purposes of possibly filing corresponding foreign applications. P.Ex. 13. Of the first twenty-six claims, claims 1, 5 and 9 were independent method claims and claims 10, 11, 16, 22, 25 and 26 were independent apparatus claims. The remaining seventeen claims were drafted in dependent form.

On December 13, 1967, a voluntary preliminary amendment was filed by Lundy's attorneys prior to any official action by the Patent Office on the merits of the application. All of the claims were revised and amended by the insertion or deletion of certain claim language. The omnibus claim 27 was cancelled and four new dependent claims, 28–31, were added. In the remarks accompanying the preliminary amendment it was suggested to the Examiner that he consider the seven United States patents and four foreign patents listed. P. Ex. 13, pp. 29–36. Of the seven United States patents listed, four [3] were classified officially by the Patent Office in class 340, subclass 146.3, the same subclass in which the Examiner indicated he conducted his search and in which the Patent is now classified. D.Ex. 11.

A search was conducted by the Examiner in subclass 340–146.3 on October 21, 1968. P.Ex. 13 (last page, search notes).

In the first Official Action by the Patent Office, dated December 9, 1968, the Examiner acknowledged receipt of the preliminary amendment. P.Ex. 13, pp. 39–44. In addition, three claims were allowed and six other claims were indicated as being allowable if amended to further specify how the reference voltage level was a function of the analog signal and how identification is made. The remaining claims were rejected by the Examiner as unpatentable over four new references not listed in the acknowledged preliminary amendment, the principal two of which were classified in subclass 340–146.3.

In a response to the first Official Action filed March 10, 1969, all of the claims (except for the three previously allowed claims) were amended and a detailed discussion was presented by Lundy's attorneys as to how the previously rejected (but now amended) claims were distinguished from the four references cited by the Examiner. P.Ex. 13, pp. 45–69.

In a second Official Action dated May 14, 1969, the Examiner allowed ten more claims (Patent claims 9, 10, 12–17, 28 and 29). P.Ex. 13, pp. 70–72. In addition, twelve claims were rejected under 35 U.S.C. § 112 as being vague and indefinite for specific reasons and nine claims were rejected as being obvious over a newly cited reference (a patent to Bartz officially classified as a cross-reference in class 340–146.3) in view of one of the references from class 340–146.3 cited in the first Official Action.

On August 13, 1969, a response was filed to the second Official Action further amending what became Patent claims 18 and 21, cancelling two claims and adding four independent method and apparatus claims (later cancelled). P. Ex. 13, pp. 73–83. A detailed discussion was included regarding the various

---

3. I. e., Seehoff, et al., Rabinow, et al., Furr, et al. and Perotto.

rejections, the newly cited references and the previously cited art.

On October 16, 1969, the Patent Office issued a third Official Action continuing the same grounds for rejection as in the second Official Action and making a new rejection of one of the newly added claims. P.Ex. 13, pp. 84–86. This action was made final in accordance with established Patent Office practice.

On February 16, 1970, an amendment after final rejection was filed adding, as requested by the Examiner, Figure 3A and an appropriate description in the specification as to the exemplary circuit details of the signal generator 60. P. Ex. 13, pp. 89–99. Additional amendments were made to five of the independent claims (which became Patent claims 1, 6, 11, 18 and 26), five claims were cancelled and a new claim was added which became Patent claim 30.

Following a telephone interview initiated by the Examiner to one of the Lundy attorneys, Granville M. Brumbaugh, Jr., on February 27, 1970, and made of record by the Examiner in the prosecution history of the Patent, the application was allowed. Stipulation; P.Ex. 13, p. 102. In accordance with this telephone interview an Examiner's Amendment was entered on April 10, 1970, setting forth amendments to what became Patent claims 1, 6 and 30. P.Ex. 13, p. 105.

## DYKAAR–LUNDY READER

The Lundy reader is a method and apparatus for recognizing highly stylized magnetic ink characters (e.g., the E–13B font) by exposing them, by means of mechanical roller apparatus, first to a magnetic charging head which installs magnetic characteristics to the ink in those characters and secondly by exposing them to a transducer [4] or magnetic reading head, the exposure being carefully regulated. Each of the fourteen characters of the E–13B font generates a distinctive analog electrical signal or waveform [5] by the response of the transducer to the magnetic characteristics of the character being read.[6] P.Ex. 15A, Appendix I.

4. A transducer is a "device capable of transforming variations in the magnetic signal representative of the ink on the document into an electrical signal." P. Br. 8.

5. An analog signal or waveform is a continuous signal representative of the variations in time of the subject being represented. It is generated in response to the changes in magnetic flux as a particular character passes under the transducer. The waveform develops from left to right ($T_1$–$T_8$) but the character is read from right to left. In other words, the portion of the waveform appearing at $T_1$ corresponds to the right edge of the character.

6. It is important to note the strict dimensions of the E–13B font. Changes in a character's dimensions occur in increments of 0.013 inch, no character being more than 7 increments in width or 9 increments in height. Furthermore, characters pass under the reading head at a constant speed of 150 inches per second. The characters pass the reading head in "flux-linking relation," i. e., in a manner whereby the head is capable of detecting increases or decreases in the total magnetized area of the part of a character appearing under the head dependent upon the individual character's configuration. As the area of magnetized ink in a portion of a character increases the transducer will detect a positive pulse (positive polarity) whose amplitude will be proportional to the increase in the amount of magnetized ink under the head at that specific instant in time. Similarly, as the amount of magnetic ink under the transducer decreases, a negative pulse (negative polarity) is generated, its amplitude being proportional to the amount of decrease in ink.

As there are only 7 increments or units of dimension from right to left in the largest character, changes in the amount of ink under the transducer may occur at only 8 intervals, the first being at the instant the first unit achieves "flux-linking relation" with the transducer, (remembering the first unit to be those in the vertical line at the right hand side of a figure) and the last being at the instant the seventh unit loses "flux-linking relation" with the transducer. At the ninth interval of time generated by the timing

The analog electrical signal generated from the reading head is amplified and fed into a "lead edge trigger circuit," whose function is to detect the input of the waveform, i.e., the arrival of a character at the transducer. When the "beginning" of the analog electrical signal is detected, the "lead edge trigger circuit" activates various timing components which permit sampling of the analog waveform at selected times as the individual character passes under the transducer.[7]

The amplitudes of the sampled portions of the developing electrical signal are compared to at least one reference voltage level which is "effective" during the generation of the timing pulses (the sampling procedure) and which is directly related to a predetermined portion of the waveform. The "lead edge trigger circuit" also activates other components which enable the reader not only to detect by means of a peak detector but store the amplitude of the first positive pluse at time $T_1$, thereby establishing from that positive pulse a reference voltage level (about which more will be said later). The output of the peak detector which has measured and stored the amplitude of the first pulse is then fed into a "reference percentage voltage generator," the function of which is to provide predetermined ratios of the peak amplitude of the first positive pulse (ratios "predetermined" to be either 15%, 30%, 45%, 60%, 80%, 100%). Each of the outputs of the "reference percentage voltage generator" is fed into the appropriate "comparator" circuit corresponding to the particular polarity and relative magnitude of the outputs. The comparator circuits then measure the amplitudes detected at $T_2$–$T_8$ as positive or negative ratios of the first positive pulse. The results of these comparisons [8] are translated into digital (discrete or non-continuous) signals,[9] which can be utilized to generate signals identifying the waveform and consequently the character in question.[10] At the termination of the scanning, reading and identification a reset signal, at time interval $T_9$, resets the mechanism for reading of the next character. P.Ex. 14; Schwartz Tr. 121–129 (Second Volume), 158, 159, 170–171.

circuitry described in the text below, the reading circuitry is reset for the next character. See Bauer deposition, pp. 75, 82, 226; Patent col. 3, lines 23, 24.

7. The "lead edge trigger circuit" is activated when the incoming electrical signal from a character reaches a fixed threshold level. Through intervening circuitry a "gated clock" circuit generates successive pulses at times $T_1$–$T_8$ which ideally correspond to the 8 intervals discussed in footnote 6.

8. In the exemplary embodiment the comparisons are made by generating timing signals at predetermined times relative to the beginning of the waveform in such a way that the timing signals will correspond to specific portions of the waveform where relevant information can be expected to be located (because of the unique attributes of the E–13B character font). In response to a given timing signal, the amplitude of the portion of the waveform or signal being generated during that time will be compared to the reference voltage levels with the result that

digital signals are then generated which are representative of this comparison.

9. The comparators provide a digital output signal whenever the analog signal at the time it appears in the waveform is of the "proper polarity and exceeds the magnitude of the respective reference voltage level" for the character waveform. The "digital signal generators," responding to signals from the corresponding "time pulse generators" and the respective comparators, generate signals of the proper polarity and relative magnitude which represent the samples of the waveform at specific time intervals in the course of the characters being scanned. P.Ex. 14, col. 5, lines 2–36. The output signals from the "digital signal generators" are stored and fed into the logic matrix.

10. Selective combinations of outputs from the signal generators are connected by means of the logic matrix to "AND" circuits for the fourteen E–13B characters. The "AND" circuits representing those characters are then connected to the desired character utilization apparatus (e. g., a computer or document sorter).

## THE DEFENDANT AND THE ACCUSED DEVICE

ORS was incorporated on August 22, 1969, for the purpose of manufacturing and selling optical character recognition equipment. This equipment was primarily intended for reading the stylized characters (E–13B characters) which appear on bank checks and the like and which are printed with magnetizable ink. The ORS optical reader did not depend upon the magnetic properties of the E–13B characters for recognition but upon their optical properties. ORS decided in early 1971 to add a MICR reader to its optical equipment. In March, 1971, James S. Bauer was hired by ORS as a consultant to develop a MICR reader suitable for use in conjunction with the ORS optical equipment, and ORS installed its first magnetic reader in July, 1971. Tyburski Tr. 448–456; P.Ex. 1. It is this reader and those subsequently manufactured and sold by ORS (designated by ORS as the "OCR–71") that is the accused device in the present litigation.

ORS:

The apparatus, being a combination Optical and Magnetic Ink Character Recognition System, makes possible two independent readings of characters in a single pass of a document. P.Ex. 18, ¶ 1.01.[11] The document passes under a permanent ceramic magnet mounted in the device's double feed detector assembly which magnetizes the ferrite-impregnated ink of the E–13B characters as they pass through the magnet's flux field. ¶ 1.0.2. After the document characters have been magnetized, they are transported to the magnetic read head which is of the conventional audio-tape-recording type. The magnetic characteristics imparted to the ink by the permanent magnet are then picked up by the reading head which generates an analog voltage signal indicative of the changes in flux fields recorded on the characters by the permanent magnet. As documents pass under the magnetic read head, individual characters will be detected as unique patterns of field strengths and polarities. The signal thereby generated is amplified by frequency sensitive amplifiers directed at providing an output normalizing signal in the order of a few volts, which is substantially free of noise and distortion. ¶¶ 2.1.1, 2.1.2; MICR Board, Sheet 1 of 1; DF # 6.

The start of a character is sensed not from the leading edge of the analog amplified signal, but from a sensing of the first peak output. This pulse serves as a synchronizing start signal which activates the circuitry to measure the field amplitudes and polarity. The actual analog signal is compared to a like signal which has been passed through a time-lag circuit, and comparison occurs when the difference of the two signals goes negative. Thus, the start signal derived therefrom cannot actually occur until the analog signal itself begins to drop from its peak value; it is derived from the point marking the first peak of the analog signal. (See diagram below.) The sharpness and precision of the start time, therefore, depend on how sharply peaked the sensed signal is. ¶ 2.2.1; Fig. 1, MICR Board 1, Sheet 2 of 2.

[A7656]

The start signal is fed to a timing circuit which generates two sets of timing pulses: a set of seven long pulses corresponding to the seven possible intervals during which the analog signal may

---

11. All paragraph references are to ORS Maintenance Manual. P.Ex. 18.

have a flux-change pulse in it; and within each of these seven intervals, a set of sixteen shorter pulses which serve to time various parts of the recognition process. ¶¶ 2.6.1, 2.8.2, 2.8.3; MICR Board 4, Sheets 1 and 2.

Because the first time-period of the analog output will always have a flux-change signal (i.e., the one which signals character starting), the following seven time periods are used to sense the particular character being scanned. The signal actually sensed in one time period is used as a reference in the next time period.

The seven sample period measures are taken by three separate comparator circuits, respectively making "small," "medium,"· and "no change" comparisons. If a comparison proves that the amplitude of the signal during one time interval is at least 50% of the value during the previous time interval, and opposite in polarity (assume that the first signal was positive, the second negative), the —M comparator will register. If the first signal has been negative, the +M comparator would indicate the second. Similarly, the ±S comparator measures signals which are at least +40% of the previous signal, and the +NC (no change) comparator measures signals which are at least 70% as high as the previous ones. ¶¶ 1.0.5, 2.3.3, 2.3.2, 2.-3.1, MICR Board 2, Sheets 1–3.

Each comparator is a circuit which can (a) store on a capacitor a positive voltage for reference; (b) store on another capacitor a negative voltage for reference; (c) selectively discharge one or the other of the two capacitors to permit a new (and perhaps smaller) reference voltage to be introduced; and (d) produce comparator output signals e.g., +M. There are thus three separate circuits for comparison, differing

only in detail. ¶ 2.3.3 MICR Board 2, Sheets 1–3.

The measurements derived from the comparators are combined and stored during the period in which the character is passing under the head of the apparatus. At the completion of the pass of the character, and consequently at the completion of the waveform, the character is identified by a series of logical gates. Beam Tr. 513. When a particular character's unique feature combination is detected, that is, when the polarity and amplitude criteria for an E–13B character are satisfied during the sampling of a character's waveform, a 4-bit binary code is developed to represent the E–13B character. ¶ 1.0.1. Other circuitry in the ORS system carries out the necessary steps of making the identified characters available to a computer system. ¶ 1.0.5; MICR Recognition Interface, MICR Board 6, Sheets 2 of 3, MICR Board 7, Sheets 1 & 2. This allows the system's programmer to analyze data captured by both the optical and magnetic ink reading methods in order to minimize character substitution and rejection while maximizing character acceptance. ¶ 1.0.1.

## I. VALIDITY:[12]

### (1) *Presumption of Validity:*

■ The plaintiff is entitled to and does rely on the presumption of validity of its patent which arises under 35 U.S. C. § 282. Blumcraft of Pittsburgh v. Citizens & Southern Nat. Bank, 407 F. 2d 557 (4th Cir. 1969), cert. denied, 395 U.S. 961, 89 S.Ct. 2103, 23 L.Ed.2d 747 (1969), reh. denied, 396 U.S. 870, 90 S. Ct. 39, 24 L.Ed.2d 125 (1969), reh. denied, 396 U.S. 949, 90 S.Ct. 369, 24 L. Ed.2d 254 (1969). That presumption remains in effect until rebutted by the party attacking the validity of the pat-

---

12. An invalid patent gives rise to no rights upon which relief in an infringement suit can be founded. Ohio Citizens Trust Co. v. Lear Jet Corp., 403 F.2d 956 (10th Cir. 1968), cert. denied, 394 U.S. 960, 89 S.Ct. 1308, 22 L.Ed.2d 561 (1969); General Mills, Inc. v. Pillsbury Co., 378

F.2d 666 (8th Cir. 1967); Wham-O-Mfg. Co. v. Paradise Manufacturing Co., 327 F.2d 748 (9th Cir. 1964). If the patent is shown to be invalid, the defendant is relieved from liability in an infringement action.

ent. Graham v. John Deere Co., 383 U. S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Westinghouse Co. v. Formica Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316 (1924). The attacker's burden of proof is a heavy one. Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., 218 F.Supp. 1 (D.C.M. D.1963), aff'd 327 F.2d 497 (4th Cir.), cert. denied, 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964).

The defendant, to rebut the presumption of validity, relies on Perotto as the most pertinent prior art; the failure of the Examiner to make reference to it in the Dykaar file; and the effect of Section 707.05(b) of the Manual of Patent Examining Procedure.[13] According to ORS, these demonstrate that the most pertinent prior art, Perotto, was not considered, and, therefore, the presumption fails. Marston v. J. C. Penney Co., 353 F.2d 976 (4th Cir. 1965), cert. denied, 385 U.S. 974, 87 S.Ct. 515, 17 L. Ed.2d 437 (1966). This would require further examination of the two patents, unaided by any presumption, to determine whether Dykaar was anticipated by Perotto and is therefore invalid and unenforceable against ORS).

Lundy argues that the defendant has failed to rebut that presumption and that the presumption is reinforced in those situations where, prior to issuing the patent, the Patent Office "had be-

fore it and *considered*" (emphasis supplied) substantially the same prior art later presented to establish the defense of invalidity. Quoting from Calico Scallopo Corp., et al. v. Willis Brothers, Inc., et al., 171 U.S.P.Q. 476, 478 (E.D.N.C. 1971), aff'd, 458 F.2d 390 (4th Cir. 1972), the plaintiff urges that the presumption is strengthened where the "principal references urged against the patent are within the classifications noted as searched, [even though] the asserted patents [are] not noted as pertinent." The plaintiff also argues that its voluntarily filing of a list of references in its 1967 preliminary amendment which included Perotto strengthens that presumption, and it offers as evidence of consideration that Perotto appears in the same class and subclass as does Dykaar and that that class and subclass was acknowledged to have been considered by the examiner. P.Ex. 13, pp. 35 & 44.

Both the plaintiff's argument in support of the presumption and the defendant's argument attacking it turn on whether Perotto is the most pertinent prior art and whether it was, in fact, "considered." It is apparent from Lundy's stipulation as to the pertinence of Perotto [14] and the reliance of ORS on Perotto that Perotto is the most pertinent prior art against which the Dykaar device must be compared. It is also evi-

13. Section 707.05(b) of the Manual of Patent Examining Procedure relating to "References Cited by Applicant" was enacted in its present form on April 13, 1967, and was effective when the preliminary amendment was filed on December 13, 1967. The provision was first published in the Official Gazette of the Patent Office on April 25, 1967 at 837 OG 1032 and read in part that:

"Prior art cited by applicants or their attorneys within thirty days of filing of the patent application, or prior to the first Office action, whichever is later, will be fully considered by the examiner, will be part of the official record, and will be included in the list of references cited in the patented file and in the printed patent provided that the applicant:

a. Limits the number of references cited to not more than five separate items, unless a satisfactory explanation is given as to why more than five citations are necessary, and submits one copy of each of the references; and,

b. Submits a detailed discussion of the references, which discussion points out, with the particularity required by Rule 111(b) and (c), how the claimed subject matter is distinguishable over the references."

14. The plaintiff has stipulated that its preliminary amendment was designed in part to distinguish the Dykaar device from the Perotto patent, and the defendant relies heavily on Perotto in its attack on the validity of Dykaar. Tr. 483, 484; D. Br., pp. 23, 24.

dent that no reference was made to Perotto by the Examiner in the prosecution of the Dykaar patent.

■ Even though not cited as a reference by the Patent Examiner, there is no presumption in a patent infringement proceeding that patents not cited were overlooked, since they may have been considered and cast aside as not pertinent. Davis v. Buck-Jackson Corp., 138 F.Supp. 908 (E.D.S.C.1955), aff'd, 230 F.2d 655 (4th Cir.), cert. denied, 351 U. S. 950, 76 S.Ct. 846, 100 L.Ed. 1474 (1956). It is as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as it is to conclude that it was inadvertently overlooked. However, the question whether the failure of the Examiner to cite certain art is consistent with its examination and rejection depends on the pertinency of the uncited art. Maschinenfabrik Rieter, A. G. v. Greenwood Mills, 340 F.Supp. 1103 (D. C.S.C.1972); Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., *supra.*

■ The failure of the Examiner to cite record art which both parties considered to be more pertinent than that in fact cited suggests that the Examiner either did not correctly understand the uncited art or else it was not brought to his attention. Lundy's reliance on *Hazeltine, supra,* to strengthen the presumption is misplaced since there was evidence there that the patents asserted against the validity of the patent in suit had been considered. However, the fact that Perotto was cited in Lundy's preliminary amendment, and the fact that the Patent Office Examiner did search Patent Office Subclass 340–146.3, the same subclass in which Perotto appears, prevents this Court from finding affirmatively that it was not brought to his attention. The Court, unlike the defendant, does not interpret Section 707.05(b) of the Manual of Patent Examining Procedure to mean that unless citations to prior art are presented in the specified form they will be ignored or will not be considered by the Examiner. Nor does the Court read that section to mean that mere failure to cite prior art in the specified form will amount to fraud or misrepresentation. To so construe that section would place the full burden of examination on the shoulders of the applicant.

The presumption of validity *is* greatly weakened by the fact that the Patent Office did not cite Perotto as reference. It was unquestionably part of the prior art and both parties acknowledge that it was highly pertinent, if not the most pertinent prior art. B. F. Goodrich Co. v. United States Rubber Co., 147 F. Supp. 40 (D.C.Md.1956), aff'd, 244 F.2d 468 (4th Cir. 1957); Blumcraft of Pittsburgh v. Citizens & Southern Nat. Bank, *supra*; Heyl & Patterson, Inc. v. McDowell Co., 317 F.2d 719 (4th Cir. 1963).

■ However, there does remain the question of whether the Examiner recognized the pertinence of Perotto, and because the presumption arising from action of the Patent Office in granting a patent should not be disregarded, especially where intricate questions involved are peculiarly within the competence of experts of the Patent Office, the Court does not find that the presumption is completely destroyed. Merck & Co. v. Olin Mathieson Chemical Corp., 253 F.2d 156 (4th Cir. 1958). The presumption is considerably weakened though, and the Court feels that it must examine the validity of the patent independently and unaided by any presumption.

(2) *Anticipation:*

As one of its affirmative defenses, ORS asserts that Dykaar claims 1–4, 9 and 28 are invalid as having been anticipated by the device described in Perotto. 35 U.S.C. § 102.

■ Because 35 U.S.C. § 112 requires that the specifications of a patent must conclude with a claim, the invention in the patent is measured by those claims. Bullard Co. v. General Electric

Co., 348 F.2d 985 (4th Cir. 1965). In considering whether Perotto anticipates Dykaar and renders it invalid, the Court must determine whether the first patent, Perotto, shows or describes a device on which the claims of Dykaar read, that is, whether the Perotto device falls within the purview of the Dykaar claims. If for each descriptive phrase in a claim there can be found in the device an element to which the phrase aptly applies, anticipation has occurred; those elements must function in substantially the same way to produce substantially the same result. Straussler v. United States, 339 F.2d 670, 168 Ct.Cl. 852 (1964); Bull v. Logetronics, Inc., 323 F.Supp. 115 (E.D.Va.1971).

Both the Perotto device and the Dykaar claims provide for MICR systems which perform their recognition functions by comparing various portions of an individual character's waveform to reference voltage levels similarly derived from the waveform.[15] Like Dykaar, the device depicted in the exemplary embodiment of Perotto is an "apparatus for the automatic recognition of printed characters . . . wherein each character is scanned for producing a . . . signal having a wave shape characteristic of said character, said character signal being sampled at different time points for producing a plurality of samples which are analyzed to identify said character." Patent 3,188,611, col. 1,

lines 10, 11, 13–15. The plaintiff argues that it is the manner in which this function is accomplished that distinguishes the two patents. The Court agrees that the mere fact that both perform a recognition function does not mean that the one anticipates the other, unless that function is performed in substantially the same way.

The operation of the Perotto device may be described as follows:

The stylized magnetic ink characters (E–13B font) are magnetized by a magnetizing head[16] and thereafter scanned by a reading head when the character is passed through the air gap of that magnetic pick-up head. The reading head then generates a modulated electrical signal, the form of which is dependent on the distribution of magnetic ink forming the dimensions and shape of the character exposed thereto, and from that modulated signal a character signal is established.[17]

The character signal is fed to a squaring circuit which produces a square signal (Patent 3,188,611, Fig. 2) which is continuously generated as long as the amplitude of the signal remains above a predetermined threshold level.[18] During the course of the generation of the character signal, the amplitude of the waveform is sampled at specific points in time relative to the "beginning" of the waveform and stored.[19] Each stored sample is then fed to a separate analog-

15. The practical goal of Perotto, Dykaar and for that matter, ORS, is an automatic recognition system capable of a high degree of reading accuracy (a minimum of improperly read documents) as well as a high degree of efficiency (a minimum of documents rejected as unreadable).

16. The magnetizing head is energized by alternate current as opposed to direct current for Dykaar.

17. The "character signal" is established by feeding the modulated signal to an amplifier, a demodulator, and a low pass filter. Col. 1, lines 48–54. The demodulator and filter extract the envelope of the modulated signal.

18. As a character comes into contact with the scanning field of the reading head,

an electrical signal begins to be generated. When that signal reaches a predetermined level a "flip-flop" circuit is "set" and energized so as to start a timing pulse generator which is operative for a period of time predetermined to be equal to the maximum possible duration of any character signal whereupon the timing pulse generator automatically stops. Col. 1, line 55; col. 2, line 2.

19. The proper predetermination of the threshold level permits the device to detect as the leading edge of the waveform signal a point which substantially coincides with the "beginning of the character signal." Perotto, col. 1, line 61.

to-digital converter which compares the incoming sample with percentages of the established "reference amplitude" in order to generate digital signals representing the amplitude of the sample as a percentage of the reference amplitude.[20] The digital signals generated by these comparators are fed to a decoder which generates a signal identifying the character represented by the digital impulses derived from the various sampling times.

*Construction of Claim:*

■■ Prior to comparing the claims of the Patent to the device disclosed in Perotto, consideration must be given to the proper construction of those claims, that is, the extent to which those claims are restricted or limited.[21]

■■■ The plaintiff, during the prosecution of the application in the Patent Office, amended certain claims to include limiting language. In December, 1967, claims 1, 9, 11, 23 and 28, were amended to include language describing a reference voltage level which is "effective" during the generation of timing signals, that amendment having been specifically intended to avoid Perotto. The words "a predetermined portion" were amended to claims 1 and 30 [22] in February, 1970, subsequent to a telephone conversation initiated by the Patent Office Examiner.[23] The plaintiff has chosen to restrict the scope of the claims by amendment in an effort to distinguish them from the prior art. Having done so and having narrowly defined terms in the Patent, the claims will be invalid as anticipated only if the alleged anticipating device falls within the purview of the claims as restricted, whether by definition of terms or by the specifications.[24]

The timing pulse generator produces 9 pulses at equally spaced intervals relative to the beginning of the character signal. Pulses #1–7 ($P_0$–$P_6$) open "transmission gates" which permits sampling of the amplitude of the waveform as it appears at those instances. Pulse #8 ($P_7$) is a timing signal and Pulse #9 ($P_8$) resets the "flip-flop" circuit thereby stopping the generator. The samples taken at pulses 1–7 are stored in a plurality of analog storage elements. (See disclosure in Perotto, col. 2, lines 3–26.)

20. Each converter is composed of three comparators, each of which compares the incoming sample to its own individual reference amplitude so as to produce either a 1 value or a 0 value output, depending on whether or not the sample is higher or lower than the reference amplitude. Dr. Schwarz Tr. 374–379.
The three reference voltages are derived from the taps of the resistive voltage divider which divides the maximum voltage detected in the analog signal and is outputted by storage element 44. Schwarz Tr. 371–374; Pat. 3,188,611, Fig. 1a. The reference voltages are, therefore, percentages of the maximum value of the waveform.

21. Once a patent issues, it is strictly construed. Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed. 2d 661 (1964), reh. denied, 376 U.S. 973, 84 S.Ct. 1131, 12 L.Ed.2d 87 (1964).

Furthermore, improvement patents (e. g., Dykaar) as distinguished from pioneer patents, must be construed in light of their specifications and drawings and the prior art, and they must be limited substantially to devices disclosed in the specifications and drawings. Westinghouse Electric Corp. v. Bulldog Electric Products Co., 106 F.Supp. 819 (N.D.W.Va.1952), aff'd, 206 F.2d 574 (4th Cir. 1953), cert. denied, 346 U.S. 909, 74 S.Ct. 240, 98 L.Ed. 406.

22. Amended to claim 30 were the words "based on a predetermined portion."

23. The word "predetermined" had been added to claim 9 by amendment on March 7, 1969, so that the words "a predetermined portion" appeared therein. Furthermore, the language appeared in the original version of the present claim 28 which was allowed March 10, 1969, and it was added by amendment to present claim 11 on March 7, 1969.

24. The claims of a patent are to be construed in light of specifications and both are to be read with a view to ascertaining the invention. United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). In interpreting a patent claim, resort may be had to the prior state of the art, the specifications, and, when related claims have been rejected by the Patent Office, to the file wrapper history. Morpul, Inc. v. Glen Raven Knitting Mill, Inc., 357 F.2d 732 (4th Cir. 1966).

The plaintiff defines "a predetermined portion" of a waveform as a portion, the parameters of which are defined in advance such that the portion is recognizable as satisfying these parameters as soon as it is generated. Schwarz Tr. 139–140; PF # 23. A reference voltage level which is derived from the initial portion of a waveform is directly related to a predetermined portion of the waveform within the context of that definition in that it is specified to occur at a certain point in time and at a specific location in the waveform. In the Patent the initial portion has been defined in advance and is immediately recognizable as the initial portion as soon as it is generated. Schwarz Tr. 139, 140; P.Ex. 14, PF # 26. It is the "predetermined portion" contemplated in the Patent. The plaintiff defines a reference voltage level, which is "effective" during the time the timing signals are being generated, as one which *must be in existence* prior to or at the times that all subsequent timing signals are generated. Schwarz Tr. 373; PF # 27.

Although it is clear that both the Perotto device and the Dykaar claims generate at least one reference voltage level and that the reference voltage level so generated is directly related to the waveform, if the Perotto device does not generate a reference voltage level which is directly related to "a predetermined portion" of the waveform and which is "effective" during the time the waveform is sampled (as strictly defined by the plaintiff and the specifications contained in the Patent) there is no anticipation.

In Perotto (as in Lundy) voltage measurements of the waveform are made at set time intervals throughout the generation of the waveform. In Perotto the maximum voltage detected in the sampling process is the source of the reference voltage levels. That voltage can occur anywhere in the waveform; it need not correspond to a portion of the waveform where the peaks generated by a typical E–13B character would be expected to occur.[25] Because the portion of a waveform at which the maximum voltage is encountered is not recognizable as such as soon as it occurs, it does not satisfy the plaintiff's strict definition of "a predetermined portion" and it is not a predetermined portion within the context of the Patent.[26] Schwarz Tr. 398–400; PF #'s 24, 25.

In further opposition to the affirmative defense of invalidity by anticipation, the plaintiff relies on the language

---

25. The use of the maximum amplitude pulse as the source of the reference permits a "noise spike" appearing randomly in the waveform as a result of extraneous ink or the like (and thus not truly representative of a feature of the character being examined) to become the basis for the identification of the waveform. Inaccuracy will result because the information derived from the comparisons of the various voltage measurements with the maximum voltage serves as the basis for identification. D.Ex. 1; Schwarz Tr. 241, 426, 431; PF #20. It should be noted that in the system described and claimed in the Patent the basing of the reference voltage level on a predetermined portion of the waveform generated by the E–13B characters makes it possible to select portions wherein actual information-bearing features of the waveform can be expected to occur. P. Ex. 14, col. 3, lines 24–25; PF #21. It is the object of such a system to prevent "noise spikes" from being detected as a feature of the waveform and thus interfering with the recognition process. Schwarz Tr. 241; PF #21.
The chance for error or inaccuracy caused by a "noise spike" is reduced in the Patent by employing as a reference voltage level only the initial peak pulse generated in the electrical signal of a character (its *analog waveform*). By reducing the points from which the reference voltage level will be determined, the device reduces the opportunity of an imperfection adversely affecting the reference voltage level and reduces the chance that an imperfection, if one exists, will affect the reading process. The use of the initial pulse as the source of the reference level serves this purpose and provides a reference which will be in existence during the generation timing pulses.

26. It is arguable that in both the Dykaar claim and the Perotto device a prior determination has been made (it has been "predetermined") that in each system

in the claims that the reference voltage level shall be "effective" during the generation of the timing signals. As previously stated, the plaintiff defines that language to mean that the reference voltage level will be *in existence (as a finally determined and known value) when the subsequent timing signals are generated.*[27]

The defendant argues that as a practical matter neither Perotto nor Dykaar can identify a character until after *all* of the various timing signals have triggered samplings of the waveform at specific points and those samples have been compared to a reference level arising out of the same waveform, i. e., identification is possible only after the waveform has passed. It is the usefulness of the reference level for purposes of comparison to other specific amplitudes in the waveform that is important, not the fact that it is known or is in existence at the time a sampling pulse is generated.

The limitation or definition urged by the plaintiff appears on first analysis to be insignificant or irrelevant as a practical matter but for the fact that it does distinguish the Dykaar claims from the Perotto device. Unless defined in this way, the language would read on the Perotto device and the Patent claims containing that language could not rely thereon to differentiate them from Perotto and thereby avoid anticipation. Whether the comparisons take place at the time of the sampling or later is immaterial as long as each sample, when compared, is compared to a common reference point, and as long as each sample so compared is representative of a certain portion of the waveform from

which that reference level was established. Therefore, the truly significant requirement would appear to be that the reference voltage level be generated from *the same waveform as that from which are derived the samples to be compared to it,* and that the reference level be *established and operable as a common reference point* for all the samples gathered in the course of a scan whether comparison occurs at the instant the sample is taken or later, after the·sample has been stored.

The plaintiff intended the definition of "effective" to be "existent," and although that definition, on first analysis, would appear to distinguish the claims containing the language from the device described in Perotto only as to form and not as to substance, the requirement that the reference voltage level be in existence during the timing pulses does more. That is, it further identifies the source of the reference voltage level as being the first sampling period or timing pulse; it further identifies "a predetermined portion." It is to that extent that the language acquires substance and serves to distinguish the claims of the Patent from the prior art device described in Perotto.

Since the Perotto device employs as reference voltages certain percentages of the maximum amplitude generated in a character's electrical signal, the reference voltage cannot be established until the entire character has been scanned (after the generation of timing pulses). Schwarz Tr. 373; P.Br. 47. Although, once established, it is "effective" or operable for comparison to all of the samples accumulated at the generation of

reference voltage levels will be established from specific portions of a waveform. In Dykaar that portion will be when the first positive pulse occurs, and in Perotto when the maximum amplitude pulse occurs. Therefore the words "a predetermined portion" as appearing in the Dykaar claims do read on the Perotto device.

However, the Court accepts the definition proffered by the plaintiff which suggests an intent on the part of the pat-

entee to designate as an element of design and as for all of the fourteen characters in the E–13B font one particular and predictable part of the waveform *in time and location* as the arbitrary source of a reference voltage level. The device is thus enabled to profit from the high degree of standardization of the waveforms generated by those characters and the information available therefrom.

27. Schwarz, Tr. 373; PF #27; P.Br. 47.

the various timing signals in the course of the scan of the waveform, it cannot be said to be in "existence" during each of the timing pulses.[28] Because this is true, the source of the reference voltage level is in no way restricted as to the time or location in the waveform, and is certainly not restricted to the first positive pulse, as is the case in the Patent.

█ The Court rejects the defendant's argument that, because the initial pulse of waveforms produced by the E-13B font is commonly the pulse with the maximum amplitude, the system for establishing a reference voltage level employed in the Perotto device, in practice, falls within the purview of the plaintiff's claims and thereby anticipates those claims. The Supreme Court held in Eibel Co. v. Paper Co., *supra*, 261 U. S. at 66, 43 S.Ct. at 329:

". . . accidental results, not intended and not appreciated, do not constitute anticipation (citing cases)."

Furthermore, since the Court must construe ambiguous language in favor of validity [29] and in line with the definition urged by the plaintiff and accepted in the Patent Office, it finds that the language in question does limit the source of the reference voltage level in the claims where it appears. The limitation of the source of the reference voltage narrows the opportunity for inaccuracy produced by "noise spikes" and capitalizes on the designed standardization of the waveforms and the predictability of the nature of the information to be found therein.

█ For the reasons stated above, the Court finds that claims 1–4, 9, 11,

23, 24, 28 and 30 do not read on the device disclosed in Perotto and are therefore not invalid as having been anticipated by that disclosure.

(3) *Claim 11—Insufficient Disclosure Defense*

█ The defendant ORS further attacks the validity of claim 11 alleging that claim 11, in addition to its similarity to claim 1, "adds structure directed to a sorting mechanism such as 'pockets,' and 'pocket gates,' a structure which is not found in the specification of the patent." ORS Br. p. 33. The defendant states that the patentee's attempt to incorporate by reference the necessary apparatus disclosed in the earlier patent No. 3,363,756, col. 1, lines 30–34, was improper and therefore ineffective.

It is clear that the material sought to be incorporated by reference was "essential material" as defined by the Manual of Patent Examining Procedure, Section 608.01(P),[30] but unlike the present form of that section,[31] the provision in effect at the time of the application for the Patent (December, 1965) did not specify that the subject of incorporation must be an established patent at the time of application, as opposed to the time of consideration or allowance of the application. That language merely provided that:

"all essential claimed features of an invention must be fully disclosed in an application without depending upon a reference to a co-pending application . . . for completing the disclosure."

28. Since the maximum pulse could conceivably occur at a time after $T_1$, the reference voltage level cannot be said to be within the definition of "effective" as urged by the plaintiff.

29. Reese v. Elkhart Welding & Boiler Works, Inc., 447 F.2d 517 (7th Cir. 1971); Standard Coil Products Co. v. General Electric Co., 306 F.2d 319 (2d Cir. 1962).

30. Essential material is that which is necessary to either support the claims

or to provide adequate disclosure of the invention.

31. Section 608.01(P) :
"An application for a patent when filed may incorporate 'essential material' by reference to (1) a United States patent, (2) an allowed U.S. application. . . . "
This language was introduced as Revision 20, April, 1969.

In any event, on January 16, 1968, the application containing the subject of incorporation issued as U.S. Patent No. 3,363,756, P. Ex. 15. That was some nine months prior to the Examiner's initiation of examination procedures on the Patent and was more than two years before the issuance of the Patent. P. Ex. 13. Therefore, at the time of the Examiner's consideration of the application, the reference was not to a co-pending application but was, in fact, a reference to an existing patent.

Because the Patent Commissioner has authority to and did, in this case, issue a patent upon an application wherein the disclosure incorporates by reference and relies on a portion of a disclosure of a then existing patent which was available to the public; because there appears no abuse of discretion in doing so; and because the Examiner did not challenge the adequacy of the disclosure of the sorting apparatus; the Court will not disturb that ruling. General Electric Co. v. Brenner, 132 U.S.App.D.C. 323, 407 F.2d 1258 (1968); Application of Fouche, 439 F.2d 1237, 58 C.C.P.A. 1086 (1971).

The incorporation by reference being effective, the claim is not invalid as being without support in the disclosure.

(4) *The Defense of Obviousness*—35 U.S.C. § 103

ORS asserts that claims 12–16, 23, 24 and 30 of the Patent, although not identical to the prior art, are invalid under 35 U.S.C. § 103 because the differences between those claims and the prior art were obvious to one skilled in the art at the time of the invention.

 Under the 35 U.S.C. § 103 requirement of nonobviousness as a condition for patentability, the Court must determine the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill [32] in the pertinent art. Graham v. John Deere Co.,

*supra.* In determining obviousness, several prior art references may be used and features may be taken from each reference to show that the subject matter of the claim as a whole would have been obvious to one of ordinary skill in the art. Spray-Bilt, Inc. v. Ingersoll-Rand World Trade Ltd., 350 F.2d 99 (5th Cir. 1965).

 Furthermore, one of ordinary skill in the art is charged with knowledge of the prior art, and evidence of attempts and failures of others to solve the problem are relevant as indicia of nonobviousness in cases where validity is in doubt. Continental Can Co. v. Crown Cork and Seal Co., 415 F.2d 601 (3d Cir. 1969), cert. denied, 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970); Diversified Products Corp. v. Sports Stores, Inc., 294 F.Supp. 375 (D.C.Md. 1968); Porter-Gable Machine Co. v. Black & Decker Mfg. Co., 402 F.2d 517 (4th Cir. 1968), cert. denied, 393 U.S. 1063, 89 S.Ct. 716, 21 L.Ed.2d 706 (1969); Maschinenfabrik Rieter, A. G. v. Greenwood Mills, *supra.* Before a patent can be declared invalid as having been obvious, the subject matter as a whole must have been obvious at the time of the invention. Hindsight reconstruction of the prior art, in itself, cannot be permitted to establish obviousness, but the prior art must be examined with foresight at a time immediately prior to the invention. "Obviousness" does not mean that one skilled in the art can perceive the solution after it has been found and identified by another. Manville Boiler Co. v. Columbia Boiler Co. of Pottstown, 269 F.2d 600 (4th Cir. 1959), cert. denied, 361 U.S. 901, 80 S. Ct. 208, 4 L.Ed.2d 156 (1959); Maschinenfabrik Rieter, A. G. v. Greenwood Mills, *supra.*

The defendant asserts that the only distinction between claims 12–16, 23, 24 and 30 and the other claims is that the former claims are limited by language

---

32. The plaintiff's expert Dr. Schwarz indicated that people commonly working in the field were engineers with Bachelor's degrees and frequently Master's degrees in electrical and mechanical engineering. Tr. 177.

requiring that the waveform generated in the recognition process shall possess polarity (negative and positive characteristics) and that the polarity characteristics as well as the amplitude information of the waveform will be analyzed to identify characters. Conversely the plaintiff relies on that limitation to distinguish the Patent from the prior art.

ORS assumes the invalidity of the claims but for the limitation and argues that, to an individual skilled in the art of MICR systems and electronic engineering, it would have been obvious that whether an analog waveform possesses polarity or not depends only on whether the magnetizing head used to magnetize the ink is energized with an AC (alternating current) or a DC signal (direct current). ORS argues further that the fact that an analog waveform derived from or generated by direct current will possess polarity whereas one generated from alternating current will not was a basic understanding of one skilled in the art of electronics of recognition systems. Tr. 340–344. The testimony of both Dr. Schwarz and Dr. Beam indicate that whether a waveform has polarity or not is of little significance since neither conveys any more information than the other, because each waveform is related to and obtainable from the other by the process of integration or differentiation. Tr. 387–388, 541; 342–344.

Additionally, the defendant argues that the use of waveforms with polarity was common in the prior art. Other than Perotto, ORS relies on the Scheid-

hauer patent No. 3,264,609,[33] the Eckert patent No. 3,168,720,[34] and the Furr, et al., patent No. 3,114,131 [35] to establish that fact. D.Br. pp. 36, 37.

The Scheidhauer patent shows in Figure 1 the analog waveforms of the fourteen E–13B characters.[36] In addition to the representation of the E–13B characters, the patent teaches a method of character identification which utilizes both the positive and negative polarity information generated at specific intervals in conjunction with a signal representative of the presence of a plurality of voltages in the waveform at the various taps of the delay line.[37] Although the Scheidhauer specifications do not make use of both polarity and amplitude (or magnitude) information derived from the various "tapping points," but only polarity and the presence of voltages, the patent acknowledges the usefulness of magnitude information and makes specific reference to the fact that both polarity and amplitude may be employed as comparison factors for identification purposes. Scheidhauer patent, col. 4, lines 13–20.

The Eckert patent (D.Ex. 2) was introduced at trial and is relied on in the defendant's brief to show the existence in the prior art of recognition systems which identify characters from waveforms possessing positive and negative characteristics (polarity) through the comparison of the amplitude of the various peaks relative to each other. Tr. 545–548; D.Br. 37. The Eckert system, rather than relying on the strict

33. Filed October 24, 1962, granted August 2, 1966; D. Ex. 9.

34. Filed April 8, 1960, granted February 2, 1965; D. Ex. 2.

35. Filed October 15, 1958, granted December 10, 1963; D. Ex. 11.

36. Those waveforms coincide in form, amplitude and dimension with those depicted in the Patent. P. Ex. 15A. However, in the Scheidhauer patent the waveforms are depicted as developing from right to left rather than from left to right as in the Patent. It must also be noted that

in the 9 character there is a slight discrepancy between times $T_5$ and $T_6$ of the Dykaar example and Pulses 4 and 5 of the Scheidhauer patent, but the discrepancy appears to be only a printing error.

37. The comparative evaluator of the Scheidhauer patent, Fig. 2, Element 14, receives the voltages from the delay line 12 and evaluates the presence of voltages at various points to determine which character is present in the reader. D. Ex. 9.

polarity characteristics,[38] employs a logic matrix designed to utilize information of relative amplitude between the various peaks. Any positive peak will necessarily be greater in amplitude than any negative peak, any positive voltage of two will be greater than a positive voltage of one, and any negative voltage of one will be greater than a negative voltage of two, etc.

In addition, the Furr, et al., patent shows a recognition system which identifies characters solely on the basis of polarity information derived from the analog waveform. D.Ex. 11.

The plaintiff counters the defendant's reliance on these prior art references by stating that Scheidhauer and Eckert are no more pertinent than the prior art considered by the Examiner; that they do not provide a foundation for the defense of obviousness; and that, as to them, the statutory presumption of validity remains intact. Otto v. Koppers Co., 246 F.2d 789 (4th Cir. 1957). In support of this argument the plaintiff states that in its Preliminary Amendment it included references to the Eldredge patent (to which Scheidhauer itself refers), the Furr, et al., patent (relied on by the defendant), and the Trimble, et al., patent (U.S. Patent No. 3,114,132) which discloses a system similar to that disclosed in Eckert. Trimble is the only one of the three which was cited as a reference by the Examiner in the patent. Because the Trimble citation indicates the Examiner's consideration of a system similar to only one of the patents upon which the defendant's obviousness defense is founded, and because obviousness may be determined only after consideration of all of the pertinent prior art, the plaintiff cannot rely on a presumption of validity as against the defense of obviousness. Application of Kuderna, 426 F.2d 385, 57 CCPA 1078 (1970); Application of Young, 403 F.2d 754, 56 CCPA 757

(1968). Therefore the Court must examine the other patents in question (the prior art) to determine whether they were searched, and, if searched, whether they were justifiably found not to be pertinent.

The Court, after an examination of the prior art (including Perotto which employs a waveform without polarity) and in reliance on the testimony of Drs. Schwarz and Beam, finds that at the time of the Dykaar invention it was obvious to one skilled in the art of electronics and recognition systems that an analog waveform either with or without polarity could be generated depending on the current used to energize the magnetizing head. The Court finds further that, although the form of the waveform may be changed, the substantive information appearing therein does not.

The Court agrees with the defendant that if the polarity limitation is the only basis upon which the validity of the claims rests then the claims relying thereon are invalid as obvious. The Court also finds that the defined distinction is not such a critical limitation nor does it constitute such a difference from the prior art as to support a determination of patentability. Storchheim v. Daugherty, 410 F.2d 1393, 56 CCPA 1147 (1969). However, the claims are more substantially limited. On March 7, 1969, the phrase "of predetermined portions" was amended to claim 12 and, consequently, to its dependent claims. P.Ex. 13, pp. 48, 49, 70. The fact that it was not until then that those claims were allowed indicates that although the Patent Examiner may have also felt the use of polarity waveforms in the form originally claimed was obvious to those skilled in the art at the time of the application, the Patent Examiner felt that the language, claiming apparatus employing means for generating digital signals representative of both polarity and relative magnitude information[39] as

---

38. That is whether, in fact, a peak is negative or positive.

39. The digital signals are generated in response to a comparison between the sample and the predetermined reference volt-

derived from *predetermined portions of the waveform*, was not obvious. The Court agrees.

Claim 23 and dependent claim 24, in addition to calling for the use of polarity and magnitude information, are further limited to apparatus employing reference voltage levels which are "effective" as discussed previously. Claim 30, in addition to requiring the use of polarity and magnitude information, contains the limiting language "a predetermined portion" and "effective" reference voltage levels as also discussed previously. Therefore each rely on more than a polarity limitation to establish nonobviousness, and the Court finds that they are valid as limited.

(5) *Claims 12–16—Defense of Invalidity Because Indefinite—35 U.S.C. § 112*[40]

The defendant complains that the terminology "predetermined reference voltage level" is misdescriptive and that the use thereof renders the claims invalid. Although the choice of words was not as precise as might be desired the references to "a predetermined reference voltage level" are not indefinite and do not render the claims invalid.

A "predetermined . . . level" would include, as the plaintiff suggests and Dr. Schwarz testified, a fixed percentage of a certain portion of the waveform. Tr. 400. "Level" is an algebraic value and a "predetermined reference voltage level" can be either an absolute (a fixed amount or voltage) or a percentage. Schwarz Tr. 400, 401. In the context of the Patent it is unlikely that the language would be interpreted to mean an absolute or fixed voltage. The exemplary embodiment employs reference voltages derived as certain percentages[41] of the amplitude of that first positive pulse. It is predetermined that the source will be the first pulse,[42] and that the "levels" will be specific percentages of the amplitude thereof.

(6) *Defense of Invalidity Because the System, as Disclosed, is Inoperative*

ORS takes the position that, by not specifically disclosing certain allegedly necessary features or details of the circuitry present in the Lundy reader, the Dykaar patent fails to comply with 35 U.S.C. § 112[43] and is therefore invalid. Specifically, ORS cites the Patent's failure to disclose a timing delay system, information as to the width of the sam-

---

age levels at different ones of the predetermined times. In other words, the reference voltage level is predetermined in the sense that it has been designated to occur and is ascertained prior to the timing signals which will supply the samples for relative amplitude information. The claim provides that the digital signals representative of polarity and relative magnitude information, be generated "at different ones of the predetermined times relative to the beginning of the electrical signal." Pat. 3,535,682, col. 8, lines 22–35.

40. 35 U.S.C. § 112, provides that:
 "[T]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

41. The exemplary embodiment shows reference voltages that are fixed percentages (15%, 30%, 45%, 60%, 80% and 100%

in Fig. 2) and are therefore "predetermined" or "settled in advance."

42. Being a function of the first pulse it necessarily follows that as to any later pulse to be compared to the reference level, the reference level will be predetermined. This is a further extension of the definition as specifically applied to the embodiment, but is not one relied on by Lundy.

43. The pertinent language of § 112 reads:
 "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable *any person skilled in the art* to which it pertains, or with which it is most nearly connected, to make and use the same. . . ." (Emphasis supplied)
 *See also*, Universal Oil Product Co. v. Globe Oil & Refining Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944).

pling pulses, a "strobe pulse," and a "reject" signal. Furthermore, ORS states that the Patent's disclosure of an improper reading direction for characters in the embodiment, Fig. 1, is a fatal defect. Fig. 1 of the Patent is a simplified perspective view of the mechanical apparatus for exposing the characters on a document to a transducer. The sample document shown in Fig. 1 is depicted as about to be passed through the reader as the MICR characters thereon are read in a left-to-right direction. MICR characters of the E–13B font are specifically designed to be read in a right-to-left direction.

■■■ Where an individual skilled in the art could, when reading the Patent, make and use the invention disclosed by the specifications by using the tools common to and known in the art and "without the necessity of further experiment itself of an inventive nature" then the Patent is not insufficiently disclosed. Henry J. Kaiser Co. v. McLouth Steel Co., 257 F.Supp. 372 (E. D.Mich.1966), *citing* National Battery Co. v. Richardson Co., 63 F.2d 289, 293 (6th Cir. 1933); Sun Ray Gas Corp. v. Bellows-Claude Neon Co., 49 F.2d 886, 887 (6th Cir. 1931). Because descriptions in patents are addressed to those skilled in the art, an applicant for a patent need not expressly set forth in his specification matters which are commonly understood by persons skilled in the art. Application of Johnson, 282 F.2d 370, 48 CCPA 733 (1960). The sufficiency of a specification must be tested in light of such fact and must be judged by what it conveys to those who are skilled in the art. Application of Nelson, 280 F.2d 172, 47 CCPA 1031 (1960). In Application of Borkowski, 422 F.2d 904 at 908, 57 CCPA 946 (1970), the Court stated:

". . . . a specification need not contain a working example if the invention is otherwise disclosed in such

a manner that one skilled in the art will be able to practice it without an undue amount of experimentation."

■■■ As to the invalidity of the Patent for failure to specifically disclose a timing delay, ORS's argument overlooks the Section 112 requirement that sufficiency of disclosure must be determined as to *one skilled in the art* of electronics and MICR systems.[44] The defendant offered evidence only to show that for proper operation of the system a delay in the commencement of timing pulses beyond the threshold level is necessary.

Although ORS introduced testimony of one of the inventors that delay is "absolutely" necessary for accurate timing, an examination of the transcript indicates that Dykaar's statement was directed to the fact that delay is "absolutely" necessary for "accurate timing," rather than for operation of the device as the defendant argues in its reply brief. Dykaar Dep., Glenhead p. 249; D. Reply Br. 9, 10. The testimony of Dr. Schwarz indicates that the device as disclosed in the Patent, when reading E–13B characters, could operate without a timing delay. Tr. 301, 302, 306, 307, 311. In any event, ORS offered no evidence that one skilled in the art would not recognize the desirability of synchronizing the timing signals with the eight points on the waveform where relevant information with respect to the E–13B character appears. On the contrary, it is clear from the record that one skilled in the art would be familiar with the E–13B character font and would recognize that the waveforms generated by the characters in this font can be expected to show relevant information at or near eight specific points. Bauer Tr. 75, 82, 226; P.Ex. 15A. Furthermore, the Patent, at col. 3, lines 4–27, specifically discloses that the positive and negative pulses (which contain the pertinent information to be derived

44. The Section 112 requirement that a patent disclosure be sufficient to enable one skilled in the art to practice it means, as the language of the section clearly indicates, one skilled in the category of art into which the disclosed device would be classified. Loom Company v. Higgins, 105 U.S. 580, 26 L.Ed. 1177 (1881).

from the waveform) may occur only at eight distinct times ($T_1$ through $T_8$). P.Ex. 14. The Patent goes on to explain that the timing pulses should be made to occur at these distinct times (col. 3, lines 4–24, 30–62; col. 4, lines 64–67). One skilled in the art would not have any difficulty in adjusting the timing signals to correspond to the times $T_1$ to $T_8$. Lundy's prior U.S. Patent No. 3,363,756 specifically discusses the desirability of synchronizing the timing pulses with the waveform peaks and sets forth in terms easily understood by one skilled in the art how this synchronization may be accomplished by the use of an initial timing delay. P.Ex. 15; Schwarz Tr. (Second Volume) 102, 115–120.

The timing and sampling techniques as employed in the Patent were conventional techniques known to persons skilled in the art who could and would have readily appreciated the desirability of a delay mechanism;[45] and the delay technique necessary to assure accurate timing was itself known in the prior art. Schwarz Tr. 359–364; P.Ex. 15; Schwarz Tr. (Second Volume) 115–120. ORS has not, therefore, established that one skilled in the art would not be able to make and use the invention by reason of the alleged insufficiency of the Patent with respect to an initial timing delay. PF # 58.

As to the Patent's failure to provide information concerning the duration of width of sampling pulses the Patent language would have clearly indicated to one skilled in the art that the purpose or object of the pulses is to permit the sampling of waveform peaks. To do so accurately, it is and would have been

readily apparent that the time lapse must be of such duration that it insures the inclusion of the peak in the area sampled. Surely nothing more than basic adjustment of the described circuitry is required to provide adequate sampling pulses. The Court agrees with the plaintiff's statement in its post-trial brief at page 25 that ". . . the time duration is a matter of choice and conventional engineering design . . ." and the Court finds that the omission of such information from the specifications is not a defect supporting the invalidity of the Patent.

A similar situation arises as to the omission of a description of a "strobe" pulse[46] or other signal which activates the identification or recognition circuitry and tells the system when to look at the information gathered from the waveform. ORS asserts that a gate or strobe signal is necessary to the practice of the invention and that since such a signal is not specifically disclosed in the Patent, the Patent fails to comply with 35 U.S. C. § 112.

It is clear from the Patent that pertinent information is to be derived from each of the comparisons made at times $T_2$–$T_8$ and furthermore that this information will be erased by a reset signal at time $T_9$. Patent col. 5, lines 15, 38–47. Thus, to attempt to identify a given character prior to $T_8$ (when the MICR character has not yet completed its pass under the transducer) or after $T_9$ (when all information derived from the waveform will have been erased) would obviously lead to meaningless or inaccurate results in the former instance, and no results in the latter. However, ORS offered no testimony or

---

45. Perotto (col. 1, lines 59–62; col. 4, line 63 through col. 5, line 9; Fig. 2) shows that the timing circuitry includes a threshold detector which, when activated at the beginning of the character signal, causes a pulse to generate timing signals for the sampling of the waveform. It does not disclose details as to duration of signals. D.Ex. 1; Schwarz Tr. 359, 362–364.

46. A gate or strobe signal is a signal that allows information to be used at the time the signal occurs. In the system described in the Patent, a gate signal would be used to merely tell the system when to look at the information derived from the waveform.

other evidence that one skilled in the art would not recognize the need for a gate or strobe signal or that recognizing the need for such a signal, he would have any difficulty designing a suitable means for providing such a signal. On the contrary, the record indicates that there are a number of ways in which a gate or strobe signal may be provided. Stein Tr., Feb. 5, 1972, p. 27. The prior Lundy '756 patent specifically shows this signal as an input to the AND circuits while the commercial Lundy devices apply the gate signal in the decoding logic. P.Ex. 15. One skilled in the art would not, therefore, have had any difficulty in either recognizing the need for or providing a proper gate or strobe signal, and the plaintiff's omission of the strobe signal, although it was a significant element, was not a defect fatal to the validity of the Patent.[47]

■ Just as none of the patent claims calls for a means for producing or being responsive to a strobe signal, neither do the claims in issue recite or require a reject apparatus. ORS contends therefore that the Patent is invalid. A reject signal is one that instructs the system, as a result of an inability to read and identify a MICR character possessing irregular characteristics, to "reject" the document upon which the unreadable character appears.

The Court does not agree with the defendant that a reject signal is necessary to the proper function of the MICR system claimed in the Patent. Therefore, the failure of the Patent to make references to a reject signal does not render the Patent invalid as being inoperative as disclosed.

The system described in Lundy's '756 patent does not utilize a reject signal. P.Ex. 15. That patent describes a system wherein the rejected or unread character is simply allowed to pass through the sorting mechanism into an always-open reject pocket. For details regarding sorting apparatus, the Patent (at col. 1, lines 31–35) specifically refers to the prior Lundy '756 patent. Stein Tr., Feb. 5, 1972, pp. 15–21; Schwarz Tr. (Vol. 1) pp. 111–112; PF # 61, 62. The fact that a reject signal is not necessary to the practice of the invention is further evidenced by the failure of Perotto to disclose or in any way discuss a "reject signal" or the situation wherein a given character is not recognized by the system. PF # 63.

The language of the Patent describes a system designed solely for the sampling of waveforms and the generation of digital signals representative of information gathered therefrom which may be employed in the identification of magnetic ink characters represented by those waveforms.[48] The Patent is not intended to, and, therefore, does not describe a sorting system or other device (add-on systems) designed to make prac-

---

47. 35 U.S.C. § 112 does not oblige a patentee, in order to make himself understood, to describe all of those elements or features of his device already familiar to others skilled in the art. He may begin at the point where his invention begins and describe what he has made that is new and what it replaces of the old. That which is common and well known in the art is as if it were written out in the patent and delineated in the drawings. Loom Company v. Higgins, *supra*; Stiegele v. J. M. Moore Import-Export Co., 312 F.2d 588 (2d Cir. 1963).
Furthermore, information or products publicly available are presumed to have come to the attention of one skilled in the art. General Tire & Rubber Co. v. Brenner, 127 U.S.App.D.C. 102, 381 F.2d 270 (1967). In that regard, the Lundy '756 patent demonstrates the use of a strobe signal. P.Ex. 15.

48. The reference to the usefulness of the resulting identifications for processing in add-on computer systems or in the control of document sorting apparatus (Patent col. 1, lines 28–31 and col. 6, lines 24–28) and the specific references to a particular example of a "Document Handling System" as described in Patent 3,-363,756 which was also assigned to Lundy (Patent col. 1, lines 30–34) indicate that the intent of the Patent is to describe only a MICR reader capable of examining and identifying magnetic ink characters from waveform information gathered, analyzed and discarded within a specific time interval and relaying that *identification* to add-on apparatus.

tical use of the reading information produced by the MICR system. Stein Dep., Feb. 5, 1973, p. 41. It is in those add-on systems that the recognition of the unreadable nature of one or more characters in a document's particular group or scheme is important, and it is in those systems, not the MICR system, that the generation and relay of reject signals is important.[49]

Even if a reject signal were vital to the operation of the system described, there is evidence that knowledge of the nature and importance of reject signals and apparatus was common in the prior art. Furthermore, Lundy's '756 patent indicates that methods of handling rejected documents and unread characters were known in the art. P.Ex. 15.

■■■ Finally, the defendant contends that the Patent is invalid because Fig. 1 shows the E–13B characters being read in the wrong direction. The Court does not feel that the positioning of the document in Fig. 1 is error which renders the Patent invalid. The disclosure of the Patent is directed to one skilled in the art of designing and making waveform recognition systems and not to a person whose job it is to feed checks and the like into an automatic reading system. PF # 55. Furthermore, Dr. Schwarz testified that one skilled in the art of MICR systems would not have been misled by the illustration in Fig. 1 in light of the fact that the characteristics and design purposes of the E–13B font were commonly known to those skilled in the art. Tr. 438.

ORS offered no proof that one skilled in the art would not recognize that the E–13B character font was specifically designed for right-to-left reading, or that he would have any difficulty in recognizing that the document shown in Fig. 1 of the Patent is improperly arranged with respect to the apparatus, at least so far as the E–13B character font was concerned. In other words, the placement of the check in Fig. 1 was merely a draftsman's error. Schwarz Tr. 414; PF # 54. The ORS brochure itself describes the reading of MICR character "O" in a left-to-right direction instead of the commonly accepted practice of reading that character in a right-to-left direction. P.Ex. 18, ¶ 1.-0.2; Schwarz Tr. 204, 205, 413, 414. As in the case with Fig. 1 of the Patent, this is merely an error on the part of the writer and would not confuse or mislead one who is skilled in the art. One skilled in the art could determine the proper reading direction for a MICR character merely by examining the character. Schwarz Tr. (Vol. 1) pp. 100–103.

*(7) Commercial Success.*

■■■ Although the plaintiff offered evidence of the commercial success of its reader systems to buttress the presumption of validity of the Patent and the patentability of the subject matter disclosed therein, that evidence can only be given secondary consideration in a case where validity is in doubt. The primary determination of patentability must be made on the basis of the technical facts

49. At pp. 15–21 of the Stein Dep., Feb. 5, 1973, Mr. Stein indicated that a reject signal is more directly related to the add-on systems such as computers or sorters than to the reader itself. It is the function of those add-on systems to receive the identifications from the reader if and when they occur, evaluate the significance of the number, nature and arrangement of those identifications within various schemes in which the characters are designed to appear, and to use that information, or lack of information, to reach various goals or to process that information for specific purposes. Since an add-on system must function off of bits of information produced by a reader in the form of identifications, it is the add-on system which must necessarily possess the capability to recognize that the reader has failed to produce the requisite bits of information in the particular standardized magnetic ink character distribution scheme applicable to the documents being handled and the function being performed. A reject may be accomplished as easily by the absence of information generated by the reader as by the presence of an actual signal indicating that a character was unreadable.

156

involved. Continental Can Co., Inc. v. Old Dominion Box Co., Inc., 393 F.2d 321 (2nd Cir. 1968); Henry J. Kaiser Co. v. McLouth Steel Corp., *supra*; Dymo Industries, Inc. v. Com-Tech, Inc., 391 F.2d 335 (9th Cir. 1968).

The plaintiff introduced evidence indicating that the system disclosed and claimed in the Patent has enjoyed commercial success with approximately $25 million in sales since 1966 to purchasers including IBM, National Cash Register, Honeywell and Olivetti-General Electric. Barbato Tr. 36; PF # 65. Olivetti-General Electric is the assignee and owner of the Perotto patent and yet still saw fit to purchase Lundy's patented system. D.Ex. 1; PF # 66. Furthermore, a total of 300 machines were delivered under contract to IBM, were assigned IBM type number IBM 1259, were sold under the IBM logo as an IBM product, were covered by an IBM warranty and were tested to determine whether they met IBM standards and specifications. The Lundy reader sorter sold to IBM was the first outside or vendor product procured by the Product Procurement Department of the Data Processing Group of IBM and there was only one other procurement by IBM of a type similar to the procurement of the Lundy machine prior to IBM negotiating and entering into a contract with Lundy.[50] Hagopian Tr. 72, 73; P. Ex. 1; PF # 67. The sales of Lundy equipment, including reader sorters incorporating the system according to the Patent, total approximately 881 units. All these machines are still in use. P. Ex. 1; Barbato Tr. 35, 36, 54; PF # 68.

This evidence is not the basis upon which the Court finds the Patent valid, but it has received secondary consideration.

(8) *Defense of Invalidity Because the Best Mode of Carrying Out the Invention was Withheld and Treated as a Trade Secret.*

The defendant's final attack on the validity of the Patent is that it fails to "set forth the best mode contemplated by the inventor of carrying out his invention" as required by 35 U.S.C. § 112.[51] More particularly, the defendant alleges that the "best mode" contemplated by Dykaar at the time of the application included an "optimized" or fully developed set of recognition logic formula for the entire E–13B font, which was not fully disclosed[52] in the Patent and, in fact, was treated as a trade secret by Lundy.

The invention disclosed and claimed in the Patent is not directed to recognition logic, but as previously stated; relates to a method and apparatus for deriving useful data in the form of information bearing digital electrical signals from a waveform. These digital signals may be interpreted by using suitable logic equations. When such equations are employed to identify the character represented by digital signals, these equations are termed recognition logic.

Claims 9 and 12–16 are described in their respective preambles as being directed to a method or apparatus for converting analog to digital signals and contain no language or limitations directing how the digital signals are to be used. P. Ex. 14; PF # 49. Claims 1, 4, 23 and 28 are directed to methods or apparatus for generating analog electrical signals and thereafter generating digital signals representative of data derived from analog signals. None of these claims contain any language or limitations directing how the digital sig-

50. The defendant seeks to minimize this by showing that purchases occurred for purposes other than the MICR system characteristics, namely, reading speed, lower cost, etc.

51. The requirement that the Patent include the best mode "known to the inventor at the time the application was filed" is mandatory. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935).

52. The Patent discloses, *by way of example*, suitable recognition logic for use in conjunction with digital signals representative of the E–13B character "O." P. Ex. 14, col. 5, lines 69–75.

nals are to be used. P. Ex. 14; PF # 50. Claims 2, 3, 11, 24 and 30 refer generally to generating character identifying signals responsive to the digital signals. These claims are in no way limited to any particular method of generating character identifying signals and are not limited as to the form of recognition logic that may be utilized to accomplish this end. P. Ex. 14; PF # 51.

As to the extent that the Patent makes reference to the use of recognition logic, testimony at the trial indicated that the recognition logic to be used in conjunction with a given recognition system can vary widely [53] and is a matter of choice for one skilled in the art.[54] Further testimony indicated that " . . . anyone [can design such logic] . . . once he has the inputs, the appropriate information . . . ,"[55] and that the design can be and often is accomplished independently of the actual invention of the system.[56]

The type and design of the logic formula to be employed in a given system will depend upon the goals of the user.[57] In other words, in a system capable of providing sufficient pertinent information from a waveform, the recognition logic and its function of analyzing that information may be "optimized" for the particular goals of the user.[58]

53. The following language appears in the disclosure of the Patent (at col. 6, lines 44, et seq.) :

"It will be understood by those skilled in the art that the exemplary embodiment is susceptible of variation and modification without departing from the spirit and scope of the invention. For example, the character reading apparatus of the invention may be readily adapted to read magnetic ink characters of other shapes, such as the bar code system of the CMC–7 type font, by suitably arranging the logic matrix to require appropriate combinations of digital signals to represent each character. . . . The analog-to-digital conversion technique of this invention thus offers wide applications for character reading apparatus. In addition, portions of the circuitry disclosed herein may be used for analog-to-digital conversion generally. Therefore, the invention is not deemed to be limited except as defined by the appended claims."

54. James Bauer Dep. (Sept. 27, 1972) 129–131; Schwarz Tr. p. 159.

55. Schwarz Tr. 406, PF # 45.

56. Although Dr. Schwarz indicated that in the instance in which he was involved in the development of recognition logic "the people who worked on the logic system were the same people involved in developing the entire system," it must be noted that the defendant's expert, Dr. Beam, testified that he was never directly responsible for developing recognition logic. Tr. 407, 570. Furthermore, the testimony of James S. Bauer, the developer of the ORS system, indicated that he had nothing to do with the development of the recognition logic and that this work was done independently by other ORS personnel. Bauer Dep. 34, 35. Significantly, they were described as "character recognition people" indicating that there are individuals who develop logic equations rather than design MICR systems in general. Bauer Dep. 127.

57. For example, if all of the available digital signals were utilized in the recognition logic to identify the character, there would be a very high probability that none of the characters would be incorrectly identified, but a significant number of the characters would be rejected as being unreadable. If only a minimum number of digital signals were to be utilized in the recognition logic, very few characters would be rejected, but there would be a greater chance of characters being incorrectly identified. Patent col. 5, lines 47–50; PF # 46. The user must therefore determine the accuracy and efficiency standards or percentages required for his purposes and design his recognition logic accordingly, based on the information available from the system. *See* Patent col. 5, lines 48–69.

58. In referring to the fact that recognition logic may be "optimized" Lundy does not suggest that there exists only one set of recognition logic formulas for a particular font which is far superior to other formulas in all situations or is a "best mode," but suggests that, given a system which is capable of supplying information of sufficient quantity and quality, a particular user of that system is able to design recognition logic which will enable him to best achieve

On the issue of the necessity of the inclusion of recognition logic to establish patentability, the Court recognizes the presumption of validity attaching to the prior art references [59] upon which the defendant challenges the validity of Dykaar and finds it significant that they make no more definitive disclosure of recognition logic than does the Patent.[60] Of even greater significance was the testimony of the defendant's recognition logic expert, Mr. Holt, who admitted that in his patents employing recognition logic, he did not specifically disclose such logic and suggested that it was not customary in the trade to freely publish recognition logic. Tr. 591, 592.

The Court therefore finds that the plaintiff did not intend to patent recognition logic; that the invention covered by the Patent was directed instead to a method or apparatus for deriving data from waveforms and identifying characters; and that the inclusion of a complete set of recognition logic equations is not necessary to establish the patentability of such a device. Consequently the failure to include a complete description of recognition logic in the Patent is not fatal to the validity of the Patent. To the extent that logic was included or described,[61] there is nothing in the record to indicate that, at the time of the filing of the application which culminated in the Patent, Lundy was aware of the existence of better recognition logic for identifying the E–13B character "O" than that disclosed in the Patent. Therefore, the treatment of the recognition logic as a trade secret is immaterial, and the failure to include a complete set of logic equations for the E–13B font does not render the Patent invalid.

### (9) Enforceability.

There is nothing in the record to indicate that Lundy intentionally misled the Patent Office as to the state of the prior art relating to the invention claimed in the Patent, nor that Lundy made any misrepresentations to the Patent Office during the prosecution of the application which culminated in the Patent. Furthermore, the record does not indicate that Lundy withheld any information it had which was relevant to the patentability of the claims of the Patent. Therefore the Court does not find, as the defendant urges, that the Patent is unenforceable because of the plaintiff's alleged inequitable conduct before the Patent Office.

---

his goals from the body of information available to him for use. However, his formula may differ from that of another, yet accomplish the same end result.

59. The Perotto Patent asserted by ORS to be the most pertinent reference with respect to the obviousness of the subject matter of the claims in suit, discloses at col. 3, lines 42–54 only the exemplary logic equation for the character "1." No other logic equations are disclosed but it is pointed out at col. 3, line 55, that "Any other character may likewise be identified. . . ." D.Ex. 1; Beam Tr. 554; PF # 41.

The Eckert Patent (D.Ex. 2), also asserted by ORS to be pertinent to the issue of obviousness, describes the nature of recognition logic as follows (at col. 3, line 73 through col. 4, line 7):

"A separate logic circuit 14 is provided for each of the characters to be recognized, and each logic circuit 14 is responsive to the outputs of a predetermined combination of comparators 13 which distinguishes one waveform from the others. Of course, the number of sampling points, the number of comparators and the choice of the predetermined combination used in the logic circuits are all dependent on such factors as the number of different characters to be recognized and the distinctiveness of the respective wave-forms produced thereby."

Eckert then discloses only the logic circuit for the character "2" (i. e., Fig. 9 and col. 6, lines 57, et seq.; PF # 42).

60. While the general vagueness of prior art patents will not relieve an applicant from the obligations of drafting his specifications and claims so as to comply with 35 U.S.C. § 112 it is a factor which may be considered. Compagnie de Saint-Gobain v. Commissioner of Patents, 251 F.Supp. 439 (D.C.D.C. 1966), aff'd, 128 U.S.App.D.C. 223, 386 F.2d 985 (1967).

61. P.Ex. 14, col. 5, lines 69–75.

## II. INFRINGEMENT

The disputed claims 1–4, 9, 11–16, 23, 24, 28 and 30 having been found valid and enforceable, a determination must be made as to whether those claims have been infringed by the accused device.

The Supreme Court in Graver Mfg. Co. v. Linde Co. (1950), 339 U.S. 605, stated at 607, 70 S.Ct. 854, stated at 855, 94 L.Ed. 1097:

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim[s]. If accused matter falls clearly within the claim[s] infringement is made out and that is the end of it."

In Long Manufacturing Co. v. Holliday (4th Cir. 1957), 246 F.2d 95 at 100, the Fourth Circuit cited Graver in stating:

"[W]e must consider the state of the prior art, the novelty and contribution of the claimed invention, the nature and extent of the differences between the patented and the accused devices, the scope of the claim of the patent and the limitations inherent in it and other surrounding circumstances."

 The claims of the Patent must be construed in light of the specifications which explain and clarify them, particularly where the embodiment is the essence of the "invention," or where it is necessary to limit the claim in order to distinguish it from the prior art. Hazeltine Research, Inc. v. Firestone Tire & Rubber Co., supra, 468 F.2d at 1279, citing City of Grafton v. Otis Elevator Co., 166 F.2d 816 (4th Cir. 1948); Hayes Spray Gun Co. v. E. C. Brown Co., 291 F.2d 319 (9th Cir. 1961). A patentee is bound by self-im-posed limitations which he notes in specifications. Straussler v. United States, 290 F.2d 827, 154 Ct.Cl. 275 (1961).

 Furthermore, "in interpreting a claim, resort may be had to the prior state of the art," [Hazeltine Research, Inc. v. Firestone Tire & Rubber Co., supra, 468 F.2d at 1279, citing Morpul, Inc. v. Glen Raven Knitting Mill, Inc., 357 F.2d 732, 734 (4th Cir. 1966)], and, as stated by the Supreme Court in Eibel Co. v. Paper Co., supra, 261 U.S. at 63, 43 S.Ct. at 328:

"[i]n administering the patent law . . . [and] . . . look[ing] into the art, to find what the real merit of the alleged discovery or invention is, . . . [the court must determine] . . . whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent to secure to the inventor the reward he deserves. If what he has done works only a slight step forward and that which he says is a discovery is on the border line between the mere mechanical change and real invention, then his patent, if sustained will be given a narrow scope and infringement will be found only in approximate copies of the new device."

The defendant further urges narrow construction of the claims of the Patent because the phrase "a predetermined portion" was a required amendment to claim 1,[62] and was added to other claims,[63] and because the words "during which time the reference voltage level is effective" were added to claim 1 by required amendment[64] thereby invoking the doctrine of File-Wrapper-Estoppel.[65]

---

62. Plaintiff's Stipulation 3. Tr. 484. The words were added in response to a telephone interview on February 27, 1970, which was initiated by the patent examiner.

63. See P.Ex. 13, Mar. 7, 1969 Amendments.

64. Plaintiff's Stipulation 2: "The preliminary amendments of December 17, 1967, to the rigidly filed claims of the application which matured into the patent in issue, 3,535,683, Plaintiff's Exhibit 14, were, partly at least, to distinguish Claim One from the Perotto Patent 3,188,611. Defendant's Exhibit 1." Tr. 483. The amendment is dated December 12, 1967.

65. In Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484, 494 (4th Cir. 1962) the court in holding that claims

Because, in the opinion of the Court, the Patent represents only a narrow advance in a crowded art [66] and because the plaintiff, by narrowly defining particular terms in the claims, has restricted those claims in a manner to differentiate the claims from the prior art in order to secure allowance and protect the validity of the Patent, a narrow construction of those claims is required in determining whether the ORS MICR system infringes. While a patentee may be his own lexicographer, the construction of a claim when patent validity is contested controls construction of the same claim when infringement is alleged. Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., *supra*; Devex Corp. v. Houdaille Industries, Inc., 382 F.2d 17 (7th Cir. 1967).

*Claim 1:*

There is no question that both systems (as well as Perotto) perform in the same manner, the same initial function [67] of

" . . . reading detectable characters on a document, comprising steps of exposing the characters to a transducer, generating an analog electrical signal susceptible of variation within a wide dynamic range and representative of each character exposed to the transducers."

That language reads on the ORS device and, consequently, the device infringes that portion of the claim. However, the Perotto device would anticipate that portion to the same extent that ORS infringes, and because it is the entire claim and not merely a portion that must provide the foundation for either a finding of anticipation or infringement, the Court must examine the claim further.

As to the extent that claim 1 claims a device for

" . . . generating at least one reference voltage level which is directly related to predetermined portion [68] of the electrical signal generated from the particular character being read,"

---

for an invention once surrendered to meet the Examiner's objections, or cancelled, or abandoned may not be reasserted quoted the Supreme Court in Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217–218, 61 S.Ct. 235, 238, 85 L.Ed. 132 (1940) :

"[T]he particular invention to which the patentee has made claim in conformity to the statute is not always to be ascertained from an inspection of the specifications and claims of the patent alone. Where the patentee in the course of his application in the Patent Office has by amendment, cancelled or surrendered claims, those which are allowed are to be read in the light of those abandoned and an abandoned claim cannot be revived and restored to the patent by reading it by construction into the claims which are allowed."

66. Evidenced by the protracted prosecution in the Patent Office and the amendments necessary to insure allowance of the application over the prior art. Hazeltine Research, Inc. v. Firestone Tire & Rubber Co., *supra*; Davis v. Buck-Jackson Corp., *supra*.

67. The descriptions of the various functions of the ORS device appear in the MICR portion of OCR–71 Maintenance Manual and will be referred to only by section number.
ORS:
1.0.1 "After the document characters have been magnetized, they are transported to a magnetic read head where flux fields recorded on the characters are converted to an analog voltage signal."
2.3.1 "Because character ferrite contend produces fields of various strengths, a wide voltage range must be handled in magnetic recording."
*Perotto:*
Magnetic heads 2 and 3 and amplifier 4, demodulator 5 and filter 6 in Fig. 1A of Perotto perform this step. Magnetic heads 2 and 3 are transducers and an analog signal representative of each character is generated at the output of filter 6. Such an analog signal is shown as waveform 46 in Fig. 2.

68. Although the February, 1970, amendment added the words "a predetermined portion" the "a" was omitted in the text of the Patent.

the Court has previously accepted the limited definition [69] urged by Lundy and the plaintiff cannot now expand the definition or benefit from a broad interpretation in order to establish infringement.

In that regard the exemplary embodiment discloses a system that employs, for reference purposes, the voltage occurring at the initial positive pulse. Dr. Schwarz, the plaintiff's expert, defined "predetermined" to mean "specified ahead of time" and testified that a "portion" as used in the claim "could be specified by an interval of time." Tr. 138, 139. This evidence, in conjunction with the amendment of the claim to secure approval, indicates that it was the intention of the plaintiff that the patented device, as limited by the claims should derive its reference voltage from a specific point in time (portion of the waveform or signal), which portion is arbitrarily chosen as an element in the design of the device. The portion so chosen was the initial positive pulse.

In the ORS system the signal actually sensed in one time period is used as a reference in the next. That is, subsequent peaks are compared against the amplitude of a preceding pulse and not against one standard reference voltage established from the initial positive pulse.[70] Not only does this permit the system to more accurately sense individual characters which have a variation of density from left edge to right edge, but it permits relatively simple logical relationships derived from these variable-reference signal measurements to sense the fourteen characters with greater accuracy. P. Ex. 18; ¶¶ 1.0.4, 1.0.5, Fig. 1; DF # 9.

In defendant's recognition concept each character has a different pattern of resetting and taking the reference voltages. No two characters will be alike, and even variations in a character will produce different reference values. There is no "predetermination" (as defined by Lundy) in establishing reference voltages, and the ORS device does not infringe claim 1 or any other claim restricted to the generation of reference voltages from "a predetermined portion" of the waveform. Tr. 515, Dr. Beam; claims 2–4, 9, 11, 16, 28, 30.

As to the portion of claim 1 which relates to the

"...[comparison of] the amplitude of the electrical signal with the reference voltage level..."

both the accused device [71] and the device described in Perotto [72] perform that function and to the extent that ORS infringes, Perotto anticipates that broad phrase.

The claim further describes a system for

---

69. See discussion in Anticipation Section.

70. An explanation of the circuitry employed in this process appears at p. 15 of the description of the accused device.

71. ORS Maintenance Manual 2.3.3 "Inverter A8 has a gain of .5. ... This reduction in signal amplitude sets up the compare level which will be used during the next stroke period to establish the 50% reference. Depending upon its output signal polarity, A8's output will charge either C7 or C9. ... The charge on C7 is coupled to pin 3 of comparator A7 via R22. Similarly, the charge on C9 is coupled to comparator A10 via R23. The input analog data signal is routed directly to A7 via R21 and to A10 via R24. ... If a negative cycle is presented to pin 4 of A7 during the next cycle period, it will be compared with the level provided by C7. If the negative cycle exceeds or equals C7's charge, A7's output goes high, indicating a negative cycle equal to 50% of the previous cycle's amplitude level. ... A10 indicates a comparison of 50% of the previous waveform but in the positive direction."

72. Dr. Schwarz testified that the comparison elements C of the Perotto device were designed and used to compare the amplitude of the electrical signal with the reference voltage levels. Tr. 374–379. The Perotto patent, col. 2, lines 36–43, specifically states "[e]ach comparator ... is adapted to compare the sample supplied thereto with a reference amplitude. ..."

" . . . generating timing signals at predetermined times relative to the beginning [73] of the electrical signal during which the reference voltage level is effective."

As previously stated, the words "during which times the reference voltage level is effective" were added by preliminary amendment in December, 1967, in order to distinguish the claim from Perotto.[74] The claims containing that language must be narrowly construed. Furthermore, in light of the prior art and the exemplary embodiment, it is evident that the reference voltage level must be ascertained and be in use (be in existence) at the very moment that subsequent timing pulses sample a character's waveform.[75] That is clearly the case in Dykaar where the initial positive pulse is always the source of the reference voltage level, but if the accused device does not fall within the purview of that restriction, the device does not infringe the claims in which the language appears, namely, all claims in issue except claims 12–16.

Unlike Dykaar, wherein reference voltages are established from a portion predetermined to be the initial positive pulse and are used and remain constant throughout the entire remaining part of the scan of a character [76] (Patent, col. 4, lines 29–31, 39–51), in ORS "there is no reference voltage in typical operation which is effective at each of the times at which a timing signal is generated." Tr. 318–319, 520–522. Although the ORS device senses the initial pulse and employs it as a reference voltage against which the waveform sample at $T_2$ will be compared, the device makes further comparisons between each succeeding voltage peak and the one preceding it.[77] Tr. 526–528. Therefore the reference voltage against which the sample at $T_4$ will be compared may not be the same reference voltage against which the sample at $T_2$ was compared. The reference voltage levels are reset during the character signal. Consequently, the device not only does not generate a reference voltage level which will be "effective" (existent) during the generation of each

73. The plaintiff's expert, Dr. Schwarz, defined the beginning of a waveform as that point in time where an electrical signal begins to be generated. That point is detected by a lead edge trigger circuit. The beginning of the waveform would be the instant the electrical signal comes into existence as ascertained by the lead edge trigger and threshold level. Tr. 148–149, 287–290, 292, 521.

74. Plaintiff's Stipulation 2; the Perotto device uses as the source of its reference voltages the voltage of the maximum pulse in the waveform. Since the maximum cannot be ascertained until after the waveform has been completely sampled, a reference voltage established therefrom cannot be effective (in existence) at the various timing pulses. Tr. 483.

75. As stated in the preceding section on anticipation, the significance of this limitation is questionable, but the plaintiff does define "effective" to mean existent. To the extent that it is so defined, there would develop a second interpretation of the word "predetermined." That is, the reference voltage level derived from the initial pulse would be "predetermined" as to the samples compared to it; it would

be determined before they are ascertained. This is not the definition urged by Lundy, however.

76. As is expressly claimed in 1–4, 9, 11, 23, 24, 28 and 30 and as implied in 12–16, the reference voltage is established from a predetermined source designated in the specifications to be the first positive pulse of the waveform. In order for the reference voltage to be in existence during the generation of timing pulses, it must be derived from the initial pulse of the waveform. It has been predetermined by design that the reference voltage level to be employed in a device covered by the patent will be one established from a portion of the waveform (i. e., at a point in time) which will permit the reference voltage level to be effective during the generation of all other timing pulses. In other words, the reference voltage level is to be established from a "portion" of the waveform predetermined to be the initial portion.

77. So long as the previous comparison was between two voltage peaks the second of which was at least half as large as the peak preceding it, the first peak being attenuated 50%.

of the timing signals, but it does not even generate one constant reference against which all samples will be compared. The resetting of the reference voltage levels during the character signal distinguishes ORS from all of the claims containing that restrictive language and therefore it does not infringe those claims. Tr. 520–528, DF # 39.

Furthermore, the timing mechanism and particularly the start mechanism of ORS differs substantially from that employed in the Patent. Timing signals are not generated relative to the beginning of the waveform, but are generated relative to the first peak. As previously stated, the start of a character is sensed, not from the leading edge of the analog amplified signal, but from a sensing of the first peak out-put. This is done, rather than by setting a positive-voltage threshold trigger, by a more complicated circuit.

As previously described, the actual analog signal is compared to a like signal which has been passed through a time-lag circuit, and comparison occurs when the difference of the two signals goes negative. Thus, the start signal derived therefrom cannot actually occur until the analog signal itself begins to drop from its peak value; the sharpness and precision of the start time, therefore, depend on how sharply peaked and sensed the signal is. ¶ 2.2.1, Fig. 1. MICR Board 1, Sheet 2 of 2; DF # 7. (See diagram below.)

[A7650]

The function of the start signal in the reading and identification process is more fully described at page 15 of the description of the ORS device.

In the exemplary embodiment of Dykaar the *timing* signals are shown as derived from sensing the *leading edge* of the analog signal, using a threshold detector which is set so as to sense the signal when it has risen to an arbitrary voltage level (at the amplifier output point). No alternative sensing scheme is proposed. Thus, since some of the characters produce larger initial pulses than others, and the time at which a given threshold is crossed depends on the overall height of the pulse (illustrated below), the timing of the characters depends not on the position of the pulse peaks to be sampled, but upon a signal threshold in the initial part of one pulse. Tr. 288–299, 310, 311, 488–493, 521, 577; DF # 35.

[A7649]

In the ORS equipment, the timing circuitry is not only derived from the peak of the first pulse, but the initiation of each successive timing pulse (the sampling intervals 2, 3, 4, 5, 6 and 7) is offset so that it should straddle each pulse peak. The ORS start signal occurs at a point after the first peak. The plaintiff's expert, Dr. Schwarz, testified that the "beginning" of the electrical signal, relative to which the Lundy timing pulses are generated, would not ordinarily be designated to occur at a time later than the first peak. Tr. 288.

Where the timing pulse is derived from a threshold of the leading edge as

in Dykaar, there is a greater chance for leading and trailing transients to influence the value sensed. Tr. 288–299, 310, 311, 577–580; DF # 36. Defendant's equipment will not work when the timing signals are generated at predetermined times relative to the beginning of the analog signal. On the other hand, the system shown in plaintiff's patent would be inoperative if it attempted to use the peak of the first pulse as a point of time initiation.

Defendant's timing system is not disclosed or defined in the claims of plaintiff's patent and is not the equivalent of the disclosed timing system. Tr. 486,493, P.Ex. 14, col. 4, lines 6–38, 64–75; DF # 38. The mechanism in the ORS device is substantially different in operation and does not infringe those claims which are limited to generating timing pulses relative to the *beginning* of the electrical signal or means [78] "responsive to the beginning" of the electrical analog signal; i.e., all of the claims in issue.

> Finally,. claim 1 claims' a device for " . . . generating digital signals at least some of which are representative of the presence of the analog signal at levels exceeding the reference voltage level at different ones of the predetermined time intervals."

However, because the plaintiff relies on the language added by amendment to claim 1 (namely, "a predetermined portion" and "during which times the reference voltage level is effective") to distinguish the subject of his claims from the prior art; because that language does not read on the accused device; and because the timing mechanism of ORS distinguishes it from the Patent; whether the accused device infringes the final phrase of the claim is irrelevant and the Court need not consider whether the final phrase reads on the accused device.

35 U.S.C. § 112 provides that a claim may be written in independent or dependent form. If written in dependent form, it must be construed to include all the limitations of the claim incorporated by reference into the dependent claim. In the present case, claims 1, 11, 12, 23, 28 and 30 are independent. Claim 1 is incorporated by reference into claims 2, 3 and 4; claim 12 is incorporated by reference into claims 13–15 and claim 16 itself is dependent on claim 15; claim 24 is dependent on claim 23. The dependent claims are, therefore, limited to the same extent as the claims that they incorporate by reference. A dependent claim can be infringed only if the independent claim (which is incorporated by reference therein) is infringed. Autogiro Co. of America v. United States, 384 F.2d 391, 181 Ct.Cl. 55 (1967).

In each of the claims in issue reference is made either to generating timing signals relative to the beginning of the analog signal (claims 1–4, 9, 11–16, 28) or to means for generating timing signals responsive to the beginning of the waveform (claims 23, 24, 30). As stated in the discussion of claim 1 above, the timing mechanism of the accused device differs substantially from that claimed in the Patent. In the exemplary embodiment of the Patent the timing system is truly responsive to the beginning of the signal,[79] while the ORS timing system being responsive to the first peak is not responsive to the elusive "beginning" of the waveform in the sense that timing is activated as soon as the

---

78. Even if the ORS timing mechanism could be said to be responsive to the beginning of the waveform signal, the Fourth Circuit in *Hazeltine* clearly held 468 F.2d at 1279:

> [T]he patentee cannot be framing his claims in terms of "means" preempt every conceivable circuit designed for a

similar purpose. Bullard Company v. General Electric Company, 348 F.2d 985, 989 (4th Cir. 1965).

That would certainly be the case where the accused device appears to be a significant advancement over the prior art.

79. P.Ex. 14, col. 4, lines 7–18.

signal is generated and detected.[80] Furthermore, the extensive use of the term "means" in the apparatus claims (11, 12–16, 23, 24, 28, 30) will not enable the plaintiff to preempt the field in regard to timing or "start" circuitry. *Hazeltine, supra.* Not only are the "means" so claimed specifically limited to those responsive or related to the beginning of the electrical or analog signal, but neither the embodiment shown in plaintiff's patent, nor any reasonable equivalent thereof, can be considered as teaching the timing mechanism and method for generation and use of reference voltages found in the accused device. The specification fails to show any variations in the scheme suggestive of alternative approaches which would encompass the defendant's developments. DF # 40.

Therefore, the Court concludes that ORS does not infringe any claim of the Lundy-Dykaar patent so restricted as to timing and start circuitry.

## III. ATTORNEY'S FEES

 ORS, relying on 35 U.S.C. § 285 [81] claims to be entitled to an award of reasonable attorney's fees because of the inequitable conduct of the plaintiff before the Patent Office in the procurement of its patent. What has been said with regard to the plaintiff's conduct in the prosecution of its application (see p. 158) is applicable here. Consequently, there does not appear to have been present the inequitable conduct charged by the defendant which would render this an "exceptional case."

 Because it is only in an exceptional case that counsel fees are awarded to the successful litigant, and since the "exceptional case contemplated by the statute occurs only where it would be grossly unjust to make the winning party bear its own attorney's fees," an award of attorney's fees in this case is not justified. Chemithon Corp. v. Procter & Gamble Co., 287 F.Supp. 291, 318 (D.C.Md.1968), aff'd, 427 F.2d 893 (4th Cir. 1970), cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); Berry Brothers Corp. v. Sigmon, 317 F.2d 700 (4th Cir. 1963); 35 U.S.C. § 285. The requests of both parties for such is therefore denied.

## IV. CONCLUSION

The Patent, although valid and enforceable, is not infringed. The ORS device, although it performs the same ultimate function as described in the Patent, employs substantially different timing circuitry and means for establishing reference voltage levels, both of which work substantial improvements over the limited claims of the Patent.

The Dykaar start signal is responsive to the "beginning" of the waveform signal. That is, the generation of timing pulses used for sampling purposes is commenced at a specific interval after the beginning of the waveform is detected as a threshold electrical signal. Unless the configuration and quality of the character is such that the initial pulse occurs simultaneously with the commencement of the sampling pulses, inaccurate synchronization of sampling pulses with waveform peaks will result. On the other hand, the start signal of ORS is responsive to the initial peak itself and the generation of subsequent sampling pulses occurs after an initial delay to insure synchronization of sampling pulses with waveform peaks. Being responsive to the initial peak rather than the "beginning" of the waveform, the ORS timing circuitry is less susceptible to inaccuracies due to "noise" and other imperfections in the quality of the character being read.

---

80. See discussion of claim 1 which demonstrates that the first peak does not occur as a function of the beginning of the signal.

81. Title 35 U.S.C. § 285 provides that "[t]he Court in exceptional cases may award reasonable attorney fees to the prevailing party."

The Patent employs as the source of its reference voltage level (or levels) the initial positive pulse occurring in an individual character's waveform. This works an improvement over Perotto's use of the maximum amplitude as the source of the reference voltage level in that the use of the initial pulse limits the variables which can affect the reference voltage. However, it does make the reference voltage, and consequently the accuracy of the identification process, dependent on the quality of that initial pulse. If that pulse is not typical of the initial pulse in an ideal character's waveform because of imperfections in the quality of the individual character being read, the reference voltage used as the foundation in the identification process will be unreliable and will undermine the accuracy of the entire identification of that character.

ORS, instead of comparing subsequent portions of the analog signal against the first amplitude peak or any predetermined portion of the waveform, compares subsequent peaks against the amplitude of a preceding pulse, provided that the preceding pulse was equal to or larger than a "medium" as compared to its preceding peak. A "medium" is at least half as large as the peak preceding it, the first peak being attenuated 50%. This permits the reference levels to be adapted to the unknown qualities of the incoming character signal, and diminishes the dependence of the identification process on a single reference level which may be inaccurate.

The Court finds that the improvements introduced by the defendant are substantial and result in greater accuracy and efficiency of identification.

Judgment is accordingly awarded in favor of the defendant; and it is so ordered.

## APPENDIX I

$t_1\,t_2\,t_3\,t_4\,t_5\,t_6\,t_7\,t_8\,t_9$ $t_1\,t_2\,t_3\,t_4\,t_5\,t_6\,t_7\,t_8\,t_9$ "TRANSIT NUMBER" "AMOUNT"

$t_1\,t_2\,t_3\,t_4\,t_5\,t_6\,t_7\,t_8\,t_9$ $t_1\,t_2\,t_3\,t_4\,t_5\,t_6\,t_7\,t_8\,t_9$

"ON-US" "DASH"

[A7654]

(1) Characters are read from right to left; but

(2) The representative waveform develops from left to right (i.e., the waveform peak at time $t_1$ of the character "O" occurs as a result of the exposure of the right edge of that figure to the transducer).